OPINION OF THE COURT
Kaye, J.
The Suffolk County Legislature, as part of an effort to *764 protect the environment, in 1988 adopted the Plastics Law, banning the use of certain plastics products by retail food establishments. This is an action by representatives of the plastics industry — a nationwide trade organization and one local member — to overturn that law.
While plaintiffs advanced several alternative grounds for nullifying the law, only one remains: that the County Legislature, as lead agency, failed to conduct an adequate environmental review before passing the law. We conclude that these plaintiffs lack standing to use the State Environmental Quality Review Act (SEQRA; ECL art 8) to that end.
I.
The Suffolk County Plastics Law is best understood by reference to certain background facts. As the State Legislature found in 1983, "the land burial and disposal of domestic, municipal and industrial solid waste poses a significant threat to the quality of groundwater and therefore the quality of drinking water in the counties of Nassau and Suffolk. This threat is particularly dangerous since the potable water supply for the counties is derived from a sole source aquifer.” (L 1983, ch 299.)
Codified as ECL 27-0704, the State law sought to prevent contamination of the aquifer by prohibiting new or expanded landfills in Nassau and Suffolk Counties, and by phasing out existing landfills, strictly limiting their operation after 1990. We sustained that law against constitutional challenge in Matter of Town of Islip v Cuomo (64 NY2d 50). Subsequently, the State Legislature has taken additional steps to safeguard the aquifer, noting that "the disposal of solid waste, both raw and treated, is a responsibility facing all towns and cities in the counties of Nassau and Suffolk.” (L 1985, chs 358, 359; see also, L 1986, ch 840.)
In furtherance of its responsibility, the Suffolk County Legislature has enacted several measures. In 1985, for instance, the County added a new article to its Sanitary Code prohibiting the storage or discharge of toxic or hazardous materials into or over water supply sensitive areas. The County also acted to ensure selection of an environmentally suitable site for a regional ash disposal facility (Weinberg, 1985 Supplementary Practice Commentary, McKinney’s Cons Laws of NY, Book 171/2, ECL 27-0704, 1991 Cum Ann Pocket Part, at 154). Additionally, in March 1988, the County Legisla *765 ture adopted Local Law No. 10-1988 — known as the Plastics Law — prohibiting the use of certain plastics products by retail food establishments, in an effort to reduce nonbiodegradable materials in the solid waste stream and facilitate a comprehensive recycling program.
Where, as here, the County Legislature acts as the lead agency under SEQRA, the Suffolk County Code requires it to submit an environmental assessment form (EAF) for review to the Council on Environmental Quality (CEQ), which then must make a recommendation as to the need for an environmental impact statement (EIS). In October 1987, after receiving the EAF on the proposed Plastics Law, the CEQ recommended issuance of a negative declaration, finding that the action had no significant environmental impact.
Beginning September 1987, and continuing for a period of six months, the County Legislature conducted eight public hearings concerning the proposed law; the Environment and Energy Committee additionally met twice to consider it. Witnesses observed that these public discussions were larger and better attended than ever before. Among the more than 70 witnesses who testified, the several environmental groups that appeared before the Legislature uniformly supported the law. Plaintiff Society of the Plastics Industry, Inc. (SPI) and others voiced their opposition to it. SPI, in particular, urged that the Plastics Law should be defeated because fast-food packaging was a miniscule portion of solid waste and the bill would therefore effect no significant benefit to the environment; it further urged that paper food wrappers themselves posed dangers to the environment. Fear was expressed by a representative of the poly bag industry that bills such as the Plastics Law could proliferate nationwide.
On March 29, 1988, the County Legislature adopted the law, including a determination that it would not have a significant adverse impact on the environment and directing the Council on Environmental Quality to circulate a SEQRA notice of determination of nonsignificance; thus, no EIS was necessary. The bill was signed into law on April 29, 1988.
Substance of the Plastics Law
Section 1 of the Plastics Law restates the County Legislature’s findings that discarded packaging constituted the largest single category of waste within the County, and that discarded nonbiodegradable packaging and plastics (particu *766 larly polystyrene and polyvinyl chloride) were a fundamental cause of municipal waste disposal problems, rapidly filling landfill space and introducing toxic byproducts if incinerated. The Legislature also found that plastic bags used by retail establishments selling food constituted the largest single retail source of plastic bags in the waste stream, and were an impediment to recycling because they are neither recyclable nor compostable. Section 1 further recites the finding that there were readily available plastic or paper product substitutes for most of the polystyrene and polyvinyl chloride retail food packaging in use in the County.
The heart of the Plastics Law is section 3, prohibiting retail food establishments in Suffolk County from selling or conveying food "directly to ultimate consumers within the County of Suffolk unless such food is placed, wrapped, or packed in biodegradable packaging at the conclusion of a sales transaction for the purchase of such food, which takes place on the premises of such a retail food establishment at or near a sales counter or equivalent customer purchasing station but prior to removal of such food from the premises of such retail food establishment.” The law further prohibits retail food establishments within the County from providing customers with utensils or containers composed of polystyrene or polyvinyl chloride.
Section 8 of the Plastics Law embodies the Legislature’s determination that the law would not have a significant adverse impact on the environment within the meaning of ECL 8-0109 (2). Instead, the section sets forth anticipated beneficial environmental impacts — that the law would encourage recycling of solid waste products, provide enhanced protection of groundwater quality, slow down rapid filling of landfill space, simplify the chemical composition of solid waste and thereby reduce the environmental hazards and toxicity associated with solid waste incineration, and reduce the cumulative impact of litter.
Plaintiffs’ Challenge
In July 1988, several representatives of the plastics industry commenced this action in Supreme Court to invalidate the Plastics Law on five separate grounds: noncompliance with various SEQRA and comparable Suffolk County environmental law requirements; preemption of the local law by State law; violation of the Equal Protection and Due Process *767 Clauses of the State and Federal Constitutions; and undue burden on interstate commerce. Plaintiffs’ standing to challenge the Plastics Law on all grounds other than SEQRA is unquestioned.
The essence of plaintiffs’ SEQRA challenge is that the County Legislature, as lead agency, failed in its administrative responsibility to address the areas of environmental concern that had been identified and prepare an EIS, or at least provide a reasoned elaboration for its determination that the law posed no significant environmental impacts. The record reveals no challenge to the County’s environmental review process other than plaintiffs’ complaint.
Plaintiff SPI is a nationwide nonprofit trade organization of more than 2,000 members, with offices in Washington, D.C., representing all segments of the plastics industry; at least eight unspecified member companies are in Suffolk County. The only Suffolk County member identified in the complaint is plaintiff Lawrence Wittman & Co., Inc. Wittman produces a variety of plastic products, none directly affected by the Plastics Law. Two other trade organizations and two out-of-State plastics manufacturers selling products in Suffolk County were also named plaintiffs. Only SPI and Wittman, in a joint submission, have participated in the litigation.
Both sides sought summary judgment. In support of standing, plaintiff SPI submitted the affidavit of its president, expressing the industry’s concern about the potential adverse environmental consequences of the Plastics Law. As he stated, SPI "is dedicated to the protection of the environmental interests of its members, and the collective membership of SPI has a strong commitment to the manufacture and sale of plastics products in an environmentally sound manner.” He identified as potential adverse consequences of the Plastics Law that, because of the increased weight and bulk of paper substitutes, SPI’s member companies in Suffolk County would suffer an increase in the difficulty and cost of waste disposal; more trucking traffic, causing damage to Suffolk County roads and additional air and noise pollution; groundwater contamination affecting water used for drinking and manufacturing processes; and increased air and water pollution resulting from the production of paper substitutes. Moreover, SPI alleged that the reduced energy content of the paper substitutes would lead to depletion of fossil fuel reserves and increased incineration and energy costs.
*768 An affidavit was also submitted by the president of Wittman alleging that it would suffer an increase in the amount of solid waste produced and disposed of in Suffolk County; increased trucking traffic necessitated by the greater volume of solid waste; increased atmospheric pollutants, water-borne waste and energy consumption due to the manufacture of paper substitutes in Suffolk County and New York State generally; and increased toxic and hazardous leachate seeping into the aquifer.
While Supreme Court dismissed all of plaintiffs’ other claims as nonmeritorious, it sustained the SEQRA challenge, holding that SPI and Wittman, having "alleged possible serious environmental injuries which will consequentially result in serious economic injuries,” had standing to maintain that claim. Projecting that a denial of standing here would necessarily "deny standing to all for-profit corporations which wish to challenge SEQRA determinations,” Supreme Court concluded that it would not "unsuit the plaintiffs by finding that they lack standing on this issue of vital public concern.” On the merits, the court held that the Legislature had violated SEQRA by failing to take a "hard look” at the environmental effects of the Plastics Law, and it stayed implementation of the law pending preparation of an EIS.
Without specifically addressing the question of standing, the Appellate Division affirmed the trial court’s holdings, except that in place of the stay it nullified the Plastics Law for noncompliance with SEQRA. The court agreed that in light of the asserted environmental harms an EIS was necessary, and it concluded further that no "reasoned elaboration” had been given for rejecting plaintiffs’ showing of adverse impacts. We thereafter granted the County’s motion for leave to appeal, and now reverse and dismiss the remaining claim on standing grounds.
II.
We begin our analysis by underscoring that, unlike the proceedings in the trial court, this appeal does not challenge the actual substance of the Plastics Law. Plaintiffs’ various attacks on the substance of the law — such as vagueness and violation of equal protection — were considered and rejected by the trial court, and no appeal has been taken from those determinations. Rather, plaintiffs’ sole remaining objection is directed to the procedure by which that law was adopted. *769 Plaintiffs contest the adequacy of the steps taken by the Suffolk County Legislature in discharging its responsibility to take a "hard look” at the environmental impact of the proposed law, contending that adverse impacts were shown and the EIS process therefore had to be set in motion (ECL 8-0111 [6]; 6 NYCRR 617.2 [v]; see generally, 6 NYCRR 617.6).
Whether a person seeking relief is a proper party to request an adjudication is an aspect of justiciability which, when challenged, must be considered at the outset of any litigation (Matter of Dairylea Coop. v Walkley, 38 NY2d 6, 9). Standing is a threshold determination, resting in part on policy considerations, that a person should be allowed access to the courts to adjudicate the merits of a particular dispute that satisfies the other justiciability criteria (see, Comment, Standing of Third Parties to Challenge Administrative Agency Actions, 76 Cal L Rev 1061, 1067-1068 [1988]; see also, Warth v Seldin, 422 US 490, 498). That an issue may be one of "vital public concern” does not entitle a party to standing. Courts' surely do provide a forum for airing issues of vital public concern, but so do public hearings and publicly elected legislatures, both of which have functioned here. By contrast to those forums, a litigant must establish its standing in order to seek judicial review.
Thus the first question we confront — ultimately dispositive here — is whether these plaintiffs are proper persons to challenge the administrative action of the Suffolk County Legislature under SEQRA. The burden of establishing standing to raise that claim is on the party seeking review.
The question of standing to challenge particular governmental action may, of course, be answered by the statute at issue, which may identify the class of persons entitled to seek review (see, e.g., State Finance Law art 7-A declaring that "any citizen-taxpayer should have and hereafter does have a right to seek the remedies provided for herein” [State Finance Law § 123]). We therefore first look to SEQRA for resolution of the issue before us.
The administrative action challenged by plaintiff — the lead agency’s environmental review — is SEQRA’s core (see, Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400, 414-416). When an EIS is required, SEQRA sets in motion a detailed process, beginning with a draft EIS and continuing through to a final EIS and written findings that the requirements of SEQRA have been met. The process itself can be a *770 lengthy one. At each step there is provision for filing and distribution, public comment periods and public hearings. The substantive component of SEQRA goes beyond its Federal counterpart, the National Environmental Protection Act (NEPA), in its direction that an agency must choose the alternatives that reduce adverse environmental effects (see, ECL 8-0109; see also, 6 NYCRR 617.6; Weinberg, Practice Commentary, McKinney’s Cons Law of NY, Book 171/2, ECL C8-0109-.1, at 73).
While highly particular in setting out the various requirements, SEQRA contains no provision regarding judicial review. In contrast, other states’ environmental statutes explicitly grant standing to "any person” or "any citizen” to enforce its provisions (see, e.g., Cal Coastal Act § 30803; see also, Fletcher, The Structure of Standing, 98 Yale LJ 221, 259 [1988]). Had the Legislature intended that every person or every citizen have the right to sue to compel SEQRA compliance — thus assuring above all else that the EIS process would be scrupulously followed, irrespective of the source of the challenge — it could easily have so provided; it did not.
A "citizen suits” bill, once included in the proposed legislation, did not appear in the final version (see, 1975 New York Legislative Record and Index, Senate Introductory Record, at S 353 [Bill S 3618]; see also, Mem of New York State Bar Assn. May 29, 1975). This bill, which several times failed to gain legislative approval, would have added an article 10 to the Environmental Conservation Law granting "standing to any person * * * to institute an action for conservation and protection of the air, water and other environmental resources of the state,” whether that person was aggrieved or not (see, Senate Debate, 1975 Legis Session, at 10152; see also, 1975 New York Legislative Record and Index, op. cit.).
Originally providing virtually unlimited access to the courts for concerned citizens, several "safeguards” were later added to the "citizen suits” bill — including a requirement that the party bringing the action post a $500 bond and submit an affidavit of a "technically qualified person” indicating the grounds for the suit. Those amendments were a response to concerns that the bill would open the floodgates to litigation (see, Senate Debate, op. cit., at 10173). Sponsors of the measure attempted to portray it as one that would allow concerned citizens, with no prospect of personal financial gain, to maintain litigation benefiting all the people of the State (see, *771 Senate Debate, at 10166), while the opposition characterized the bill as encouraging "use of environmental protection machinery as a delaying, obstructive tactic” (see, Senate Debate, at 10224).
By rejecting the proposed open door policy, the Legislature made clear that some limitation on standing to challenge administrative action was appropriate. The unanswered question is what that limitation should be.
In the years preceding the adoption of SEQRA, substantial concern was expressed as to the cost of implementation, increased State intrusion on local affairs, and potential delay of crucial municipal projects on spurious environmental grounds (see, Stevenson, Early Legislative Attempts at Requiring Environmental Assessment and SEQRA’s Legislative History, 46 Alb L Rev 1114, 1120 [1982]). One County Executive warned, for example, that unless "parameters are built into the legislation, all government actions would be easy targets for Court cases, effectively allowing anyone who is opposed to a proposed action for any reason, environmental or not, to limit our ability to act.” (Letter from Alfred B. Del Bello, Westchester County Executive, to Governor Carey, dated July 2, 1975, Bill Jacket, L 1975, ch 612; see also, Mem of Power Auth of NY, dated July 1, 1975 [experience with NEPA proves that power to block action by challenging sufficiency of environmental review is often exercised by private pressure groups acting through the courts].)
The legislative history that is available suggests that concern over improper use of "citizen suits” as a delaying tactic may have led to defeat of the bill (see, Senate Debate, op. cit.). In rejecting standing for "any person,” however, the Legislature did not provide any alternative standard. Thus, as in other areas, the legislative history of SEQRA "is not definitive and probably will not be heavily relied upon by the courts in interpreting the many unanswered questions.” (Stevenson, op. cit., at 1127.)
In the absence of an answer in the statute, we turn to the case law on standing.
III.
With the growth of litigation to enforce public values, such as protection of the environment, the subject of standing has become a troublesome one for the courts. The Federal courts especially, have struggled in public interest cases to define *772 who is a proper party to seek judicial review. Despite hundreds of Supreme Court opinions and dozens of commentaries dealing with standing, no mechanical rules of general applicability have emerged (see, e.g., Valley Forge Coll. v Americans United, 454 US 464, 475; Fletcher, The Structure of Standing, 98 Yale LJ 221 [1988]; 4 Davis, Administrative Law § 24:1 [2d ed]). While there has been far less difficulty in the State law, to the extent that we have common doctrines (see, e.g., Matter of Dairylea Coop. v Walkley, 38 NY2d 6, 9, supra), we also have common problems.
The standing requirement in Federal actions has been grounded in the Federal constitutional requirement of a case or controversy (US Const, art III, § 2, cl 1; see, e.g., Allen v Wright, 468 US 737, 750-752, reh denied 468 US 1250; Valley Forge Coll. v Americans United, 454 US, at 471-474, supra), a requirement that has no analogue in the State Constitution. However, the principle that only proper parties will be allowed to maintain claims is an ancient one, long predating the Federal Constitution (see, e.g., Note, "More than an Intuition, Less than a Theory”: Toward a Coherent Doctrine of Standing, 86 Colum L Rev 564, 570 [1986]; Berger, Standing to Sue in Public Actions: Is it a Constitutional Requirement?, 78 Yale LJ 816 [1969]). Under the common law, there is little doubt that a "court has no inherent power to right a wrong unless thereby the civil, property or personal rights of the plaintiff in the action or the petitioner in the proceeding are affected.” (Schieffelin v Komfort, 212 NY 520, 530; see also, Roosevelt v Draper, 23 NY 318, 323; Doolittle v Supervisors of Broome County, 18 NY 155.)
Whether derived from the Federal Constitution or the common law, the core requirement that a court can act only when the rights of the party requesting relief are affected, has been variously refashioned over the years. Once a "legal interests” test requiring a litigant to allege injury to a legal interest derived from common or statutory law (see, e.g., Tennessee Power Co. v Tennessee Val. Auth., 306 US 118, 137-138), "injury in fact” has become the touchstone during recent decades (Data Processing Serv. Orgs. v Camp, 397 US 150, 152-153; Matter of Dairylea Coop. v Walkley, 38 NY2d 6, 9, supra). The existence of an injury in fact — an actual legal stake in the matter being adjudicated — ensures that the party seeking review has some concrete interest in prosecuting the action which casts the dispute "in a form traditionally capable of judicial resolution.” (Schlesinger v Reservists to Stop the War, *773 418 US 208, 220-221.) The requirement of injury in fact for standing purposes is closely aligned with our policy not to render advisory opinions (see, Cuomo v Long Is. Light. Co., 71 NY2d 349, 354).
Injury in fact thus serves to define the proper role of the judiciary, and is based on "sound reasons, grounded not only in theory but in the judicial experience of centuries, here and elsewhere, for believing that the hard, confining, and yet enlarging context of a real controversy leads to sounder and more enduring judgments.” (Bickel, The Least Dangerous Branch, at 115 [1962].)
To this essential principle of standing, the courts have added rules of self-restraint, or prudential limitations: a general prohibition on one litigant raising the legal rights of another; a ban on adjudication of generalized grievances more appropriately addressed by the representative branches; and the requirement that the interest or injury asserted fall within the zone of interests protected by the statute invoked (see, Allen v Wright, 468 US, at 751, supra). It is the last of these limitations, adopted at both State and Federal levels, that has evolved into the crucial test for standing in the administrative context and is most pertinent to the appeal now before us (see, Matter of Dairylea Coop. v Walkley, 38 NY2d 6, 9, supra; see also, Clarke v Securities Indus. Assn., 479 US 388; cf., Greer v Illinois Hous. Dev. Auth., 122 Ill 2d 462, 524 NE2d 561 [Illinois refusing to adopt zone of interests test]).
The zone of interests test, tying the in-fact injury asserted to the governmental act challenged, circumscribes the universe of persons who may challenge administrative action. Simply stated, a party must show that the in-fact injury of which it complains (its aggrievement, or the adverse effect upon it) falls within the "zone of interests,” or concerns, sought to be promoted or protected by the statutory provision under which the agency has acted (Lujan v National Wildlife Fedn., 497 US —, —, 110 S Ct 3177, 3186; see also, Matter of Mobil Oil Corp. v Syracuse Indus. Dev. Agency, 76 NY2d 428, 433).
At the Federal level, the zone of interests limitation may be traced to the Administrative Procedure Act, which provides access to judicial review to any person "adversely affected or aggrieved * * * within the meaning of a relevant statute.” (5 USC § 702.) The requirement that the injury suffered be *774 within the zone of interests sought to be protected by the statute serves to filter out cases in which a person’s "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that [the drafters] intended to permit the suit.” (Clarke v Securities Indus. Assn., 479 US, at 399, supra.)
In State law as well, the requirement that a petitioner’s injury fall within the concerns the Legislature sought to advance or protect by the statute assures that groups whose interests are only marginally related to, or even inconsistent with, the purposes of the statute cannot use the courts to further their own purposes at the expense of the statutory purposes. This is particularly meaningful in SEQRA litigation, where challenges unrelated to environmental concerns can generate interminable delay and interference with crucial governmental projects. We have recognized the danger of allowing special interest groups or pressure groups, motivated by economic self-interests, to misuse SEQRA for such purposes (see, Matter of Mobil Oil Corp. v Syracuse Indus. Dev. Agency, supra; see also, Matter of Sun-Brite Car Wash v Board of Zoning & Appeals, 69 NY2d 406, 413, rearg denied sub nom. Allen Avionics v Universal Broadcasting, 70 NY2d 694).
One further established principle in the law of standing bears note.
In land use matters especially, we have long imposed the limitation that the plaintiff, for standing purposes, must show that it would suffer direct harm, injury that is in some way different from that of the public at large (see, e.g., Matter of Mobil Oil Corp. v Syracuse Indus. Dev. Agency, 76 NY2d 428, supra; Matter of Sun-Brite Car Wash v Board of Zoning & Appeals, 69 NY2d, at 413, supra; Little Joseph Realty v Town of Babylon, 41 NY2d 738, 741-742; Cord Meyer Dev. Co. v Bell Bay Drugs, 20 NY2d 211, 216, rearg denied 20 NY2d 970; Empire City Subway Co. v Broadway & Seventh Ave. R. R. Co., 87 Hun 279, 283, affd 159 NY 555; see also, Worth v Seldin, 422 US, at 499, supra). This requirement applies whether the challenge to governmental action is based on a SEQRA violation (Matter of Mobil Oil Corp. v Syracuse Indus. Dev. Agency, supra; Matter of Har Enters. v Town of Brookhaven, 74 NY2d 524, 528-529), or other grounds.
The doctrine grew out of a recognition that, while directly impacting particular sites, governmental action affecting land use in another sense may aggrieve a much broader commu *775 nity. The location of a gas station may, for example, directly affect its immediate neighbors but indirectly affect traffic patterns, noise levels, air quality and aesthetics throughout a wide area. The concept of a plaintiff’s aggrievement, generally necessary to secure judicial review, was therefore refined and restricted by the courts in such matters to require that plaintiffs have a direct interest in the administrative action being challenged, different in kind or degree from that of the public at large (see, e.g., 2 Anderson, New York Zoning Law & Practice § 26.06 [3d ed]).[1]
These same principles of standing apply whether the party seeking relief is one person or, as in the present case, an association of persons.
In the area of associational or organizational standing, the applicable principles are embodied in three requirements (see, Matter of Dental Socy. v Carey, 61 NY2d 330). First, if an association or organization is the petitioner, the key determination to be made is whether one or more of its members would have standing to sue; standing cannot be achieved merely by multiplying the persons a group purports to represent. Second, an association must demonstrate that the interests it asserts are germane to its purposes so as to satisfy the court that it is an appropriate representative of those interests. Third, it must be evident that neither the asserted claim nor the appropriate relief requires the participation of the individual members. These requirements ensure that the requisite injury is established and that the organization is the proper party to seek redress for that injury.
We next apply these principles to the facts at hand.
IV.
Factually, this case presents a variation from the more *776 common scenario of associations dedicated to environmental preservation seeking to represent the interests of persons threatened with environmental harm (see, e.g., Save a Valuable Envt. v City of Bothell, 89 Wash 2d 862, 576 P2d 401; Sierra Club v Morton, 405 US 727). In such instances, in-fact injury within the zone of interest of environmental statutes has been established by proof that agency action will directly harm association members in their use and enjoyment of the affected natural resources (see, e.g., United States v Students Challenging Regulatory Agency Procedures, 412 US 669, 687). Here, by contrast, the parties seeking relief under SEQRA are a nationwide association of plastics interests and for-profit member corporations in the business of making and selling plastics products, entities whose economic interests are not served by bans on plastics products.
Plainly, the lead plaintiff, SPI — the association of plastics interests — does not have standing to challenge the Suffolk County Legislature’s SEQRA compliance because it has not demonstrated that the interests it asserts in this litigation are germane to its purposes.
SPI purports to seek the protection and promotion of its members’ environmental interests, meaning the effect of the continuing manufacture of plastics products on the environment. In SPI’s own words, "the collective membership of SPI has a strong commitment to the manufacture and sale of plastics products in an environmentally sound manner.” But here, SPI is asserting members’ rights themselves to be free of any adverse effects a local law might have on their own immediate environment. Such claims would be personal to SPI’s members, and have no relation to the industry-wide purposes represented by the association. Protecting member companies from local conditions, such as the quality of their air and traffic congestion on their roads, cannot be said to be germane to the purposes of this nationwide trade organization (see, Matter of Dental Socy. v Carey, 61 NY2d, at 333, supra).
Plaintiffs’ standing therefore depends wholly on Wittman— the only named party with a presence in Suffolk County.
Few facts are known as to Wittman. It does not appear at all in the sizeable record of documents and testimony submitted by scores of citizens and groups during the County Legislature’s hearings on the Plastics Law. Wittman has alleged that it has an office in Copiague, Suffolk County, and employees, and it manufactures fiberglass products. The ques *777 tion, therefore, is whether, by tendering a corporate address in Suffolk County, Wittman has established its standing to challenge the County Legislature’s issuance of a negative declaration. We conclude that, based on the tenuous assertion of harm it would suffer, Wittman has failed to qualify for standing to maintain this particular claim.
The purposes of SEQRA, as stated by the Legislature, are to encourage productive and enjoyable harmony with our environment; "to promote efforts which will prevent or eliminate damage to the environment and enhance human and community resources; and to enrich the understanding of the ecological systems, natural, human and community resources important to the people of the state.” (ECL 8-0101.) Under the general heading "Legislative findings and declaration,” SEQRA sets out, among its overriding principles and objectives, the "maintenance of a quality environment for the people of this state” (ECL 8-0103 [1]), and it provides that every citizen "has a responsibility to contribute to the preservation and enhancement of the quality of the environment.” (ECL 8-0103 [2].)
Clearly, the zone of interests, or concerns, of SEQRA encompasses the impact of agency action on the relationship between the citizens of this State and their environment. Only those who can demonstrate legally cognizable injury to that relationship can challenge administrative action under SEQRA. Though couched as environmental harms, plaintiff’s assertions of injury by and large amount to nothing more than allegations of added expense it might have to bear if plastics products were banned and paper products substituted. In this category, for example, are allegations that the Plastics Law, by adding to the County’s solid waste stream, will increase disposal, truck traffic, energy and incineration costs. Assertions that increased paper manufacturing throughout New York State threaten it with added energy consumption, atmospheric pollutants and water-borne wastes are not only largely economic but also ephemeral allegations of harm threatening plaintiff.
That plaintiff raises economic concerns of course does not foreclose its standing also to raise environmental injury (see, Matter of Niagara Recycling v Town Bd., 83 AD2d 335, 341 [Hancock, Jr., J.], affd 56 NY2d 859). However, economic injury does not confer standing to sue under SEQRA. Economic injury is not by itself within SEQRA’s zone of interests *778 (see, Matter of Mobil Oil Corp. v Syracuse Indus. Dev. Agency, 76 NY2d 428, 433-434, supra).
In the end, the various allegations of plaintiffs threatened environmental harm come down to these: that the greater volume and weight of paper substitutes in Suffolk County will increase trucking traffic to and from disposal sites, with attendant noise, congestion and emissions; and that paper substitutes will increase waste in landfills, with attendant effects including possible hazardous leachate seeping into the aquifer.
We conclude that this plaintiff-having failed to allege any threat of cognizable injury it would suffer, different in kind or degree from the public at large — lacks standing to maintain this SEQRA challenge.
Here, the need for special injury within the zone of interests of the statute being challenged is fully consonant with traditional standing concepts (see, e.g., Matter of Mobil Oil Corp. v Syracuse Indus. Dev. Agency, 76 NY2d 428, supra). A plaintiff threatened with such a concrete injury plainly has the requisite incentive to press the matter. It is not seeking an advisory opinion, and it is not misusing the statute to delay or defeat governmental action and thereby advance ends outside the legislative purview. With particular respect to SEQRA, an assertion of special environmental harm evidences that the named plaintiff "has a significant interest in having the mandates of SEQRA enforced.” (Matter of Har Enters. v Town of Brookhaven, supra, at 529.)
Although the challenged administrative action does not concern zoning, its impact falls on particular sites, centering not on the points of sale of plastics products but on the points of disposal. As set forth in section 1 of the Plastics Law, the intent of the Legislature was to reduce landfills by altering the composition of Suffolk County’s solid waste. Harmful effects allegedly flowing from the increased volume of solid waste in the landfills and their adjacent areas necessarily increase as distances from the landfills decrease.[2] Similarly, *779 any alleged harmful effects of increases in trucking traffic to and from the landfills would necessarily fall directly on those near such traffic. To the extent that manufacture of paper substitutes threatens environmental harm, again it would be residents close to those facilities that would directly suffer the alleged harms.
In sum, the threatened environmental impacts of this particular law are such that certain Suffolk County residents can show a special or differentiating harm, providing a large pool of potential plaintiffs whose interests satisfy the policy goals of SEQRA and of the standing doctrine, with no compromise of the courts’ commitment to the enforcement of SEQRA. This is not a case where to deny standing to this plaintiff would be to insulate governmental action from scrutiny (see, Matter of Har Enters. v Town of Brookhaven, supra, at 529). Thus, we need not and do not reach the issue whether, in instances where solely general harm would result from a proposed action, a plaintiff would have standing to raise a SEQRA challenge based on potential injury to the community at large. Plaintiff itself makes no such claim.
We note that the result in this case is consistent with the policy of protecting the welfare of the community by limiting judicial review of remedial legislation when such challenges are made by pressure groups seeking to delay or defeat action in order to further their own economic interests (see, Matter of Sun-Brite Car Wash v Board of Zoning & Appeals, 69 NY2d 406, supra; see also, Churchill Truck Lines v United States, 533 F2d 411, 416 [8th Cir]). While there is much to be said for permitting judicial review of SEQRA claims at the request of every citizen, it is equally true that allowing "everyone to seek review could work against the welfare of the community by proliferating litigation, especially at the instance of special interest groups, and by unduly delaying final dispositions.” (Matter of Sun-Brite Car Wash v Board of Zoning & Appeals, 69 NY2d, at 413, supra.) Citizens have an interest in efficient governmental action as well as an interest in adequate environmental review.[3] The established requirement of direct injury in cases such as the one before us strikes the proper balance, under SEQRA, between both public interests.
Finally, we subscribe wholeheartedly to the dissent’s call for *780 clarity and accuracy. In the immediate case, it should be clear that despite unprecedented public response to legislative hearings on the Plastics Law — including the unanimous endorsement of the Environmental Defense Fund, the National Resource Defense Council, the Long Island Sierra Club, the Long Island Citizens Campaign (whose stated purpose is protection of the Long Island drinking water), the New York Public Interest Research Group, Defenders of Wildlife, indeed every environmentalist who appeared, none of whom noted a threat to the aquifer — only the plastics industry, a private interest group, has sought to overturn a law adopted as a step toward protecting the environment, on the assertion that environmental review was inadequate. Even the Long Island Association Environment. Committee, quoted in the dissent, lodged no such challenge.
The Environmental Defense Fund — asserting its particular interest and involvement in plans for the protection of Long Island groundwater — and the Natural Resource Defense Council additionally both appeared before the trial court as amici in support of the Plastics Law presenting — with defendants— evidence of the environmental threats offered by the plastics products and environmental benefits posed by the Plastics Law. Were it appropriate to consider the merits here — which it is not — the few paragraphs in the dissent regarding adverse effects of the Plastics Law could be multiplied many times over, by the statements and submissions of the environmentalists as to the beneficial effects of the bill, viewed as a first step toward resolving the County’s garbage crisis. The plastics industry brought this to a halt.
But characterizations as to which position champions the environment in the immediate case are of lesser concern than accurate portrayal and perception of the rule that governs this and future cases. As is apparent even in the dissent, no new standing requirement is fashioned by the majority. Our real difference lies in whether the Plastics Law could in any sense be deemed geographically centered in its aim and effect, or indiscriminate; if the former, we all agree that special harm has long been required (dissenting opn, at 787-788). We conclude that the challenged action here is more akin to localized than indiscriminate action.
While the dissent would limit the first category to zoning laws, the better approach is to look to the aim and impact of the action, whether in the form of a zoning ordinance, a local *781 law or other government action. Here, the challenged action is aimed at reducing solid waste entering the County landfills and the alleged environmental impact is on those areas and associated sites. We explicitly do not reach the question of standing to challenge actions that apply indiscriminately to everyone, whether a local law permitting all residents to throw their garbage in the streets (dissenting opn, at 789), or any other action.
Accordingly, the order of the Appellate Division should be reversed, with costs, and the defendants’ motion to dismiss the first cause of action granted.

. The dissent is simply wrong in its assertions that special harm has never before been required in a SEQRA challenge to administrative action. Most pointedly, the dissent would rewrite this Court’s unanimous decision of barely a year ago, Matter of Mobil Oil Corp. v Syracuse Indus. Dev. Agency (76 NY2d 428), a SEQRA challenge to administrative action in which we made clear — following immediately upon our discussion of the requirement of "special damages” (meaning injury that is different in kind and degree from the community generally) — that Mobil had to "demonstrate that it has suffered special injury before it can be accorded standing to challenge SIDA’s review of the project.” (76 NY2d, at 433.) Mobil, moreover, hardly involved a small, localized activity. The challenged action there concerned funding for a 50-acre development in downtown Syracuse.

. The dissent’s quotation from testimony of the Long Island Association Environment Committee — a business group — illustrates the point well. As the Committee wrote: paper wrappings release " 'all of [their] chemicals into the landfill, causing a leachate run-off and contaminating the landfill and other nearby areas. The non-biodegradable plastic wrapping which it is replacing does not disintegrate, thus allowing no chemicals to be released into the landfill at anytime.’ ” The landfills are plainly the focus of the quotation. (Dissenting opn, at 783.)

. As the Supreme Court observed in another connection, citizens dissatisfied with legislative action also "need not overlook the availability of the normal democratic process.” (Warth v Seldin, 422 US 490, 508, n 18.)