[675 NYS2d 653]

CYNTHIA RUDDER et al., Appellants, v GEORGE E. PATAKI, as Governor of the State of New York, et al., Respondents.

Third Department, July 2, 1998

### APPEARANCES OF COUNSEL

*Schulte, Roth & Zabel,* New York City (*David M. Brodsky* of counsel), for appellants.

*Dennis C. Vacco, Attorney-General,* Albany (*Robert M. Goldfarb* of counsel), for respondents.

### OPINION OF THE COURT

WHITE, J.

On November 30, 1995, one month prior to the scheduled sunset of the regulatory review agency formerly known as the Office of Regulatory and Management Assistance, defendant Governor issued Executive Order No. 20 (9 NYCRR 5.20 [hereinafter the executive order]) which established the position of Director of Regulatory Reform (hereinafter the Director) with the authority to oversee the review of proposed agency regulations. The executive order set forth the responsibilities of the Director including, but not limited to, oversight of the regulatory process of State agencies, analysis of the impact of proposed and existing rules on matters such as public health, safety and welfare, and making recommendations for simplifying the regulatory process, including a cost-benefit analysis and analysis of a rule's impact on the creation or retention of jobs. In addition, prior to an agency's submission of proposed or revised rulemaking for publication in the State Register, the rule must be submitted to the Director for evaluation and approval. If the Director determines that the submission is complete, it is then submitted with the Director's recommenda-

tion to a four-member committee* which may then authorize publication, disapproval or revision of the rule if it does not meet the criteria set forth in 9 NYCRR 5.20.

This action arises from a constitutional challenge to the executive order following the disapproval by defendant Director of a Department of Health proposal to amend 10 NYCRR 405.28 (d). This rule requires each hospital in the State, excepting rural or non-urban hospitals, to have an organized social work department under the direction of a qualified medical social worker. The proposed amendment, *inter alia,* required that the director of the department of social work in each covered hospital have a Master's degree in social work from an accepted educational program. After reviewing the proposed rule, the Director found that the amendment did not comply with the criteria set forth in the executive order and issued a notice of noncompliance to the Commissioner of Health. The Commissioner responded and a second notice of noncompliance was issued by the Director. Thereafter the Commissioner submitted no further information to refute the Director's objections, the proposed rule expired on June 10, 1996 and a final determination was never made by the Director.

Plaintiffs commenced this declaratory judgment action seeking to have the executive order declared unconstitutional and, following joinder of issue, both parties moved for summary judgment. Supreme Court granted summary judgment in favor of defendants and dismissed the complaint. Plaintiffs now appeal.

The initial issue we must confront is whether plaintiffs have standing to maintain this action. This must be determined at the outset of any litigation since standing is a threshold determination and a litigant must establish standing in order to seek judicial review, with the burden of establishing standing being on the party seeking review (*see, Society of Plastics Indus. v County of Suffolk*, 77 NY2d 761, 769, 772). The party seeking relief must demonstrate that it will suffer direct harm or injury that is different in some way from that of the public at large (*see, Matter of Lee v New York City Dept. of Hous. Preservation & Dev.*, 212 AD2d 453, 454, *lv dismissed in part and denied in part* 85 NY2d 1029; *Matter of Hoston v New York State Dept. of Health*, 203 AD2d 826, 827, *lv denied* 84 NY2d 803).

---

* The committee consists of defendants Secretary to the Governor, Counsel to the Governor, Director of State Operations and the Director of the Division of the Budget.

In *Matter of Eaton Assocs. v Egan* (142 AD2d 330), where an executive order promulgating an affirmative action program without legislative authorization was challenged as unconstitutional under the doctrine of separation of powers, this Court held that the petitioner lacked standing as there was no showing that it had suffered any personal injury fairly traceable to the executive order. Further, a party must show that the injury of which it complains falls within its zone of interest and is not a generalized grievance, and the fact that the issue may be one of wide public concern will not entitle a party to standing (*see, Valley Forge Coll. v Americans United*, 454 US 464, 475-476; *Matter of Kirmayer v State of N. Y. Civ. Serv. Commn.*, 236 AD2d 705, 706, *lv denied* 89 NY2d 815; *Matter of Otsego 2000 v Planning Bd.*, 171 AD2d 258, *lv denied* 79 NY2d 753).

■ Plaintiff Cynthia Rudder, the Director of the Nursing Home Community Coalition of New York State, claims standing as a citizen taxpayer pursuant to State Finance Law § 123-b. Under this section an action against an officer or employee of the State challenging the expenditures or appropriations of its funds may be maintained, but unless the expenditures can be clearly traced to identifiable State funds the plaintiff lacks standing to pursue such an action (*see, Matter of Schulz v State of New York*, 217 AD2d 393, 395; *Matter of Schulz v Cobleskill-Richmondville Cent. School Dist. Bd. of Educ.*, 197 AD2d 247, 251). Other than general references to improper spending by defendant Office of Regulatory Reform, plaintiff has failed to designate with any specificity either the amount of funds to be expended or the manner in which the expenditure will occur. Therefore, she lacks standing under State Finance Law § 123-b.

■ The 10 organizational plaintiffs are a potpourri of agencies involving social workers, nursing home advocates and other advocates for the aged and disabled, as well as the Women's City Club of New York and the League of Women Voters. Mindful that the present regulations provide that a qualified medical social worker would have to be replaced by a person holding a Master's degree in social work, we find a lack of any specific harm to any of the plaintiff organizations other than generalized statements that continuing with the present rule would somehow diminish the care presently available or have a deleterious effect on patients. From a reading of plaintiffs' brief, it is clear that the main contention of plaintiffs is that the executive order vests the Governor's Office of Regulatory Reform with a "virtually limitless" veto power in

the rulemaking process, a concern which is more appropriately addressed by the Legislature (*see, Society of Plastics Indus. v County of Suffolk*, 77 NY2d 761, 773, *supra*).

Since no final determination was made in the challenged proceeding and any anticipated harm to the plaintiffs is remote and highly speculative, we find that plaintiffs have failed to sustain their burden of establishing standing in this matter.

MERCURE, J. (dissenting). We respectfully dissent. In our view, Supreme Court was correct in its summary rejection of defendants' threshold challenges to justiciability and standing but erred in its on-the-merits determination to dismiss the complaint. We conclude that Executive Order No. 20 (9 NYCRR 5.20 [hereinafter the executive order]) constitutes an unprecedented and legally impermissible usurpation of administrative agencies' traditional rulemaking authority in favor of a select group of gubernatorial appointees and that it should be struck down as violative of the doctrine of separation of powers and contrary to controlling statutory law.

Initially, we concur in the majority's implicit rejection of defendants' assertion that the controversy is not justiciable. Notwithstanding the fact that the Commissioner of Health ultimately abandoned her effort to cure the objections posed by defendant Director of Regulatory Reform (hereinafter the Director) and that, as a result, the Department of Health's proposed rulemaking died through inaction rather than at the hand of defendant Office of Regulatory Reform, the very real threat of veto rendered the controversy justiciable (*see, Washington Airports v Noise Abatement Citizens*, 501 US 252, 265, n 13). Nor do we view this as a challenge relating solely to the internal administration of a coequal branch of our State government. Rather, as properly asserted by plaintiffs, defendant Governor's assumption of the authority of other governmental branches is "eminently justiciable" (*see, Jiggetts v Grinker*, 75 NY2d 411, 415).

Turning now to the issue of standing, we cannot subscribe to the majority's implicit conclusion that not one of the organizational plaintiffs has satisfied the tripartite test for organizational standing, i.e, that (1) some or all of the members themselves have standing to sue, (2) the interests which the organization seeks to protect must be germane to its purposes, and (3) neither the relief requested nor the claims asserted require the participation of the individual members (*see, Matter of Dental Socy. v Carey*, 61 NY2d 330, 333-334; *see also, So-*

ciety of Plastics Indus. v County of Suffolk, 77 NY2d 761, 775). As detailed in the majority opinion, the specific factual predicate for plaintiffs' challenge to the executive order is the disapproval of a proposed rule of the Department of Health that would have amended 10 NYCRR 405.28 (d) so as to require that directors of hospital social work departments possess a Master's degree in social work (hereinafter MSW) from an accredited educational program. Obviously, if promulgated, the proposed rule would have created additional job opportunities for those holding an MSW degree; conversely, the de facto veto of the rule had the effect of depriving them of that pecuniary and professional advantage.

Plaintiff New York City Chapter of the National Association of Social Workers is an organization which, according to the allegations of the complaint, represents approximately 9,600 social workers, most of whom possess an MSW degree. Similarly, plaintiff 1199 National Health and Human Service Employees Union is alleged to represent 115,000 health care employees. Of those, approximately 3,000 are social workers, many of whom also possess an MSW degree. Under the circumstances, we have little difficulty concluding that at least these two organizations have standing to challenge the executive order. First, for the reasons stated in the preceding paragraph, those organizations' MSW degree-bearing members have been adversely affected by the operation of the executive order, conferring standing upon them (see, Matter of New York State Assn. of Community Action Agency Bd. Members v Shaffer, 119 AD2d 871, 874). Second, an important interest to be promoted in the litigation—enhanced professional opportunities for those possessing an MSW degree—is highly germane to those organizations' purposes. Third, nothing in the relief requested or the causes of action asserted requires the participation of individual members of those organizations. Thus, the three-part test for organizational standing has been satisfied (see, Society of Plastics Indus. v County of Suffolk, 77 NY2d 761, 775, supra; Subcontractors Trade Assn. v Koch, 62 NY2d 422, 426; Matter of Dental Socy. v Carey, 61 NY2d 330, 333-334, supra; Community Serv. Socy. v Cuomo, 167 AD2d 168).

It is instructive to contrast the cases relied upon by the majority in support of its contrary view. In Society of Plastics Indus. v County of Suffolk (supra), the organizational plaintiff was properly denied standing because of its failure to satisfy the second prong of the three-part test for organizational standing. There, a trade association of plastics manufacturers,

purportedly seeking to advance its members' " 'strong commitment to the manufacture and sale of plastics products in an environmentally sound manner' " (*id.*, at 776), pursued a decidedly inconsistent goal in its effort to thwart a "green" law which prevented Suffolk County retail food establishments' sale of food products in other than biodegradable packaging. "Protecting member companies from local conditions, such as the quality of their air and traffic congestion on their roads, cannot be said to be germane to the purposes of this nationwide trade organization" (*id.*, at 776).

In *Matter of Eaton Assocs. v Egan* (142 AD2d 330 [which does not in any event involve an issue of organizational standing]), the petitioner claimed status as a minority business enterprise but challenged an executive order which actually favored minority business enterprises. Thus, this Court concluded that the petitioner lacked standing because it had not suffered any personal injury fairly traceable to the executive order or, put another way, lacked standing to complain of any injury which the "order may inflict in a constitutional sense upon others" (*id.*, at 334). We are similarly unpersuaded by defendants' reliance upon this Court's decisions in *Matter of Kirmayer v State of N. Y. Civ. Serv. Commn.* (236 AD2d 705, 706, *lv denied* 89 NY2d 815 [no standing for party asserting wholly speculative " 'injury' * * * stemming from his purported inability to apply for an unspecified position that might have become vacant through the promotion of some unknown individual"]) and *Matter of Sheehan v Ambach* (136 AD2d 25, *lv denied* 72 NY2d 804 [a party's interest in protection from the economic impact of competition will not generally confer standing]) and the decision of the First Department in *Matter of Queens Hosp. Ctr. Community Advisory Bd. v New York City Health & Hosps. Corp.* (227 AD2d 147, *lv denied* 88 NY2d 814).

We also feel compelled to note that the majority's restrictive view of standing would undoubtedly limit the class of potential objectors to officials of State administrative agencies. Because such high-ranking gubernatorial appointees could not realistically be expected to attack the constitutional validity of executive action, such a view would have the practical effect of immunizing the executive order from judicial scrutiny (*see, Boryszewski v Brydges*, 37 NY2d 361, 364; *Community Serv. Socy. v Cuomo*, 167 AD2d 168, 170, *supra*; *Matter of New York State Assn. of Community Action Agency Bd. Members v Shaffer*, 119 AD2d 871, 875, *supra*). Finally, unlike the majority, we do not view plaintiffs' concern over the executive order's

"virtually limitless" veto power in the rulemaking process as a matter more appropriately left to the Legislature. The Legislature has already addressed (and, in fact, preempted) the area by expressly granting administrative agencies the authority to promulgate regulations. In any event, it is the function of the courts and not the Legislature to determine the constitutionality of executive orders.

On the merits, we agree with plaintiffs that the executive order violates the doctrine of separation of powers and is also inconsistent with governing law. Fundamentally, the State Constitution provides for a distribution of powers among the three branches of government (*see,* NY Const, art III, § 1 ["(t)he legislative power of this state shall be vested in the senate and assembly"]; art IV, § 3 [the Governor "shall take care that the laws are faithfully executed"]; art VI), an arrangement that serves to prevent an excessive concentration of power in any one branch or in any one person (*see, Rapp v Carey,* 44 NY2d 157, 162; *see also, Under 21, Catholic Home Bur. for Dependent Children v City of New York,* 65 NY2d 344, 355). Where, as in the case of the Governor, "power is delegated to one person, the power is always guided and limited by standards" (*Rapp v Carey, supra,* at 162); the Governor has only those powers that have been delegated to him by the Constitution and statute (*see, id.,* at 166). As related to the various entities within the executive branch, including administrative agencies, the effect of the foregoing is that the Governor has the power to *oversee* but not necessarily to *direct* (*id.,* at 162). Thus, and bringing us to what we perceive to be the crux of the matter, although "the executive has the power to enforce legislation and is accorded great flexibility in determining the methods of enforcement * * * he may not * * * 'go beyond stated legislative policy and prescribe a remedial device not embraced by the policy' " (*id.,* at 163, quoting *Matter of Broidrick v Lindsay,* 39 NY2d 641, 645-646 [citations omitted]).

It is true, as pointed out by defendants, that the Legislature has articulated a basic policy favoring regulatory reform and has enacted laws requiring administrative agencies to give due consideration to a number of factors in connection with the exercise of their rulemaking authority, among them laws providing for public comment on proposed rules (State Administrative Procedure Act § 202 [1] [a]), for the filing of a regulatory impact statement in connection with proposed rulemaking, addressing the issues of statutory authority, needs and benefits, costs, necessary reporting requirements, local govern-

ment mandates, duplication, alternative approaches, applicable Federal standards and the time necessary for compliance (State Administrative Procedure Act § 202-a [2], [3]), and for the minimization of adverse economic impacts on small businesses and local governments (State Administrative Procedure Act § 202-b [1]) and on public and private sector interests in rural areas (State Administrative Procedure Act § 202-bb [2]). Many of these worthwhile guidelines are mirrored in the executive order.

In fact, we have no quarrel with a general policy favoring agency reform and do not question the desirability of any provision of the executive order or the power of the Legislature to enact laws restricting agencies' rulemaking authority, in an effort to simplify and reduce the cost of government for the benefit of businesses and the citizenry of the State. At issue here is the Governor's authority to fill the legislative vacuum resulting from the sunset of State Administrative Procedure Act former § 202-c and, more particularly, to curtail powers that have already been conferred upon administrative agencies by the Legislature. In our view, the executive order's grant of absolute veto power over proposed rulemaking provides an enforcement mechanism far exceeding that employed in any present or former legislative enactment. Employing "absolute rules and proscriptions" instead of guidelines (*Rapp v Carey*, 44 NY2d 157, 163-164, *supra*), that aspect of the executive order lacks any cognizable legal basis.

We are unpersuaded by defendants' reliance upon the decisions of the Court of Appeals in *Bourquin v Cuomo* (85 NY2d 781) and *Clark v Cuomo* (66 NY2d 185) for a contrary view. In each of those cases, the challenged executive order provided nothing more than a moderate positive impetus in a direction that had been expressly approved by the Legislature. In *Clark v Cuomo* (*supra*), the Governor implemented a legislative mandate " 'to encourage the broadest possible voter participation in elections' " (*id.*, at 190, quoting Election Law § 3-102 [13]) by requiring all agencies having significant contact with the public to make voter registration forms available and to provide necessary assistance in completing them (*Clark v Cuomo*, *supra*, at 187). In *Bourquin v Cuomo* (*supra*), a bare majority of the Court of Appeals upheld an executive order that authorized the creation of a private not-for-profit Citizens' Utility Board and gave it access to four State mailings each year as a permissible implementation of a legislative mandate to " 'promote and encourage the protection of the legitimate

interests of consumers within the state'" (*id.*, at 785-786, quoting Executive Law § 553 [2] [b]). Highlighting the innocuous nature of the challenged executive order, the majority hastened to point out its lack of "substantive content beyond that of creating the [Board] itself and giving it access to State mailings for a three-year period" (*id.*, at 787). As pointed out by plaintiffs, in neither of those or, in fact, any of the cases relied upon by defendants did a court uphold an executive order arrogating new powers to the executive. Rather, in each case, the executive order that was upheld merely provided for a procedural mechanism to implement a policy expressly set forth by the Legislature. Notably, in this case, defendants have failed to identify where the Legislature set forth any "'basic policy decisions'" (*id.*, at 785) authorizing an executive veto of proposed administrative regulations.

In sharp contrast, executive orders imposing a substantial burden or restraint and lacking sufficient legislative authority have been routinely struck down by the courts. For example, in *Rapp v Carey* (*supra*), the Court of Appeals struck down then-Governor Carey's Executive Order No. 10.1, which required State employees to file financial disclosure statements and to abstain from activities that were not prohibited by statute. Rejecting the argument that Executive Order No. 10.1 merely implemented the provisions of Public Officers Law § 74, the Court held that the order "is not an implementation of section 74; it is a nullification of it—a nullification, however benevolent in purpose, without benefit of legislative action" (*id.*, at 164-165). In *Under 21, Catholic Home Bur. for Dependent Children v City of New York* (65 NY2d 344, *supra*), the Court of Appeals held that the Mayor of New York City had no authority to promulgate an executive order prohibiting employment discrimination by City contractors on the basis of "'sexual orientation or affectional preference'" (*id.*, at 353), employing the following reasoning: "Congress, the State Legislature and the City Council have enacted laws restricting the bases upon which most private employers may discriminate. None of these legislative bodies, however, has chosen to include a person's 'sexual orientation or affectional preference' among the proscribed bases, nor have they established any general requirement that employment decisions must be merit-based. An attempt by the Mayor to broaden the class of persons protected from discrimination by private employers, or to require that all employment decisions be merit-based, however commendable, is an enactment of policy which the City Charter leaves to the

City Council" (*id.*, at 359; *see, Matter of Broidrick v Lindsay*, 39 NY2d 641, *supra* [affirmative action program for New York City contracts]).

Not only do we find no constitutional or legislative authority for the executive order's grant of veto power to the Governor's committee, we agree with plaintiffs that this prohibitionary provision actually nullifies specific grants of rulemaking authority given to the agencies and divests these statutory rulemaking bodies of the discretion given them by the Legislature. Using the present case as an apt illustration, the Legislature has provided the Commissioner of Health, together with the State Hospital Review and Planning Council, with final rulemaking authority in connection with hospitals and other health care facilities (Public Health Law § 2803 [2] [a]). Notably, the Legislature has established specific professional qualifications for the Commissioner of Health, who must be a physician with at least 10 years' experience in the actual practice of medicine (Public Health Law § 203), and for the members of the State Hospital Review and Planning Council (*see*, Public Health Law § 2904), entitling their rulemaking decisions to considerable judicial deference (*see, Matter of Levine v Whalen*, 39 NY2d 510, 518). In contrast, the Director and members of the Governor's committee need be possessed of no such professional qualifications. Nonetheless, under the regulatory review procedure established by the executive order, the lay members of the Governor's committee are given absolute veto power over rules prescribed by the Commissioner, regardless of the professional expertise required to properly assess and evaluate them (*see, id.*, at 516-517).

Our view is unaffected by the assurance, provided by counsel to the Office of Regulatory Reform, that the executive order "was not intended to apply to agencies or entities whose heads or member(s) are not appointed by the Governor and subject to his direction and control * * * [and] has not, and * * * will not be applied to these other agencies or entities". Obviously, although it would have been a simple matter to write such an express limitation into the executive order, none was included. We are also bothered by the rationale underlying that assurance, which seems to presume the authority of high-ranking executive appointees to control the actions of agencies whose heads happen to serve at the pleasure of the Governor and, in fact, to legally prevent such agencies from carrying out the powers and duties granted them by the Legislature. To us, the Governor's power to remove the Commissioner of Health is not

equivalent to the authority to control the independent discharge of her responsibilities while she remains in office.

Based upon the foregoing, we conclude that in promulgating the executive order and particularly so much thereof as bestows the Governor's committee with complete veto power over agency rulemaking efforts, the Governor has exceeded his authority by creating a remedial device that far exceeds, and in fact contradicts, established legislative policy.

For the foregoing reasons, we would reverse Supreme Court's order and declare the executive order to be unconstitutional.

CARDONA, P. J., and CREW III, J., concur with WHITE, J.; MERCURE, J., dissents in a separate opinion in which SPAIN, J., concurs.

Ordered that the order is affirmed, without costs.