OPINION OF THE COURT
Colleen McMahon, J.
In this CPLR article 78 proceeding, petitioner Consolidated Edison Company of New York (Con Ed) seeks to overturn a recently enacted modification of a contract between respondent Power Authority of the State of New York (PASNY) and Smith Barney, Inc., as successor-in-interest to Shearson Lehman/ American Express, Inc., on the ground that the resolution authorizing the modification (which Con Ed describes as a new contract) violates section 1005 of the Public Authorities Law and article 6 of the Economic Development Law. PASNY argues that Con Ed lacks standing to bring this proceeding and that its arguments are wrong as a matter of law and fact. Because *236 PASNY is correct on both counts, the petition is denied and this proceeding is dismissed.
BACKGROUND
In 1984, the State Legislature passed the sixth unnumbered paragraph of Public Authorities Law § 1005, which permitted PASNY to sell up to 36 megawatts (MW) of excess nuclear power generated at its Fitzpatrick Nuclear Power Project to up to three businesses in southeastern New York State (i.e., the New York City metropolitan area and its “exurbs”) that were not “high load factor manufacturers” and that would agree to build or expand facilities and create new jobs within the State. PASNY was required to conclude these contracts before July 1, 1985.
Pursuant to that law, on December 6, 1984, PASNY entered into contract FD-14 with Shearson Lehman/American Express for up to 16 MW of that 36 MW total. Under contract FD-14, the amount of power provided to Shearson (which later merged with and became known as Smith Barney) was a function of the number of employees the company employed at the covered facilities. The contract contained a number of what were termed “Special Provisions for service supplementing or modifying the Rules and Regulations for Power Service” to cover various contingencies that might arise in the future. Special provision C, entitled “Reductions in Allocation”, set forth the conditions under which PASNY could reduce its power allocation to Smith Barney, or Smith Barney could reduce its contract demand; per special provision C any such reduction in allocation made after 1990 “shall be permanent”. Special provision D, entitled “Additional Power”, allowed Smith Barney to make written application to PASNY for additional power, which PASNY was authorized, in its sole discretion, to make available. The contract runs through 2001, but pursuant to special provision K, it can be extended.
Shearson, and then its successor-in-interest Smith Barney, have utilized power under this arrangement since 1986. In 1993, when the contract was assigned to Smith Barney, the parties reduced the customer’s maximum allocation downward, from 16 to 12 MW, to reflect the fact that the customer’s actual usage had been below the 16 MW level. Pursuant to special provision C of contract FD-14, this reduction was deemed “permanent”. Despite this reduction, Smith Barney committed to maintain employment at 2,500 employees at the affected facility. In the PASNY report recommending modification of Smith *237 Barney’s maximum allocation, PASNY noted that the power released by Smith Barney would become available for new industrial locations.
Last year, Smith Barney, as was its right pursuant to special provision D, asked that its power allocation be increased back to the 16 MW level. In exchange, Smith Barney offered to increase the number of jobs it would maintain at the affected facilities (now two in number) to 3,350. PASNY, acting pursuant to the discretion given to it by special provision D, agreed to Smith Barney’s request. PASNY passed a resolution to that effect on August 26, 1997 and sent a letter “set[ting] forth the changes the Authority has agreed to make with respect to the direct firm power service provided to Smith Barney, Inc. under contract FD-14.” (Petition, exhibit 6.) At the time this change was made, not all 36 MW of power PASNY was permitted to allocate under the 1984 law were spoken for — indeed, all 24 MW not already allocated to Smith Barney were not being used at the time — so the 1997 modification merely restored Smith Barney to its original position, using a portion of the same 36 MW from which it had always drawn under contract FD-14.
Con Ed challenges this increased allocation of power as violative of a subsequently passed amendment (unnumbered para 9) to Public Authorities Law § 1005, and a correlated provision, article 6 of the Economic Development Law. In 1987, the Legislature changed the method by which PASNY could sell its relinquished industrial allocations of Fitzpatrick power. It denominated any Fitzpatrick power relinquished by a business as Economic Development Power (EDP) and set up an Economic Development Power Allocation Board (EDPAB) to review requests for EDP against certain enumerated statutory criteria, and then to recommend to the Authority how it should allocate the EDP.
Con Ed takes the position that the 4 MW of power relinquished by Smith Barney in 1993 is EDP and can only be reallocated pursuant to the recommendation of EDPAB. Concededly, Smith Barney and PASNY did not follow the EDPAB procedures when Smith Barney was awarded the additional 4 MW in the summer of 1997. PASNY takes the position that it was not required to apply to EDPAB before allocating additional Fitzpatrick power to Smith Barney, because: (1) Smith Barney was permitted at request an additional allocation of Fitzpatrick power at any time during the duration of contract FD-14 under special provision D, which PASNY had sole discre *238 tion to grant or deny, and (2) the 1987 legislation explicitly stated that “Nothing contained in [article 6 of the Economic Development Law and the corresponding amendment of Public Authorities Law § 1005] shall affect the validity of any contract or agreement for the sale or disposition of power produced by the power authority in effect on the effective date of this act during the remaining term thereof.” (L 1987, ch 32, § 6.)
PASNY also argues that the 1987 legislation creating EDP did not negate or override the 1984 legislation under a variety of principles of statutory construction. And it alleges that Con Ed lacks standing to bring this proceeding. Con Ed’s admitted interest in challenging the 1997 modification of contract FD-14 (which Con Ed insists is a wholly new contract, not a modification of an existing agreement) is that Smith Barney would have to purchase any extra power from Con Ed if PASNY had not granted its request for an additional 4 MW. PASNY argues that this sort of competitive economic injury does not fall within the zone of interests that the 1987 legislation was intended to protect.
CONCLUSIONS OF LAW
1. Con Ed Lacks Standing to Bring This Proceeding
PASNY is correct when it asserts that Con Ed lacks standing to prosecute this proceeding. Under New York law (Society of Plastics Indus. v County of Suffolk, 77 NY2d 761, and cases cited), a party having standing to challenge an administrative action must suffer some “injury in fact” (at 772) that “is in some way different from that of the public at large” (at 774) and that “fall[s] within the zone of interests protected by the statute invoked” (at 773). Con Ed admittedly will suffer some “injury in fact” from not being able to sell Smith Barney the additional 4 MW of power it wants, and that “injury in fact” is indeed distinct from any injury that the public at large might suffer from PASNY’s action. However, diminution of Con Ed’s coffers was not of concern to the Legislature when it passed the 1987 EDPAB legislation.[1] To the contrary, the Legislature was expressly concerned with reducing energy costs *239 to businesses by providing them with power more cheaply than Con Ed (and the other public utility companies) were willing to do. The Legislature clearly believed that offering this reduced cost power (and thereby taking revenue away from Con Ed and other utilities) would spur economic development and job creation or retention. Its legislative findings and declarations provide: “The legislature finds and declares that energy costs may have a significant impact on the economic development, job creation, and the location and expansion of business in the state. The legislature further finds and declares that the reduction of energy and other costs to business can serve as an effective initiative to promote economic development, including the retention of existing jobs, the development of new investment, and the creation of employment.” (L 1987, ch 32, § 1.) Con Ed’s lost opportunity for additional customer revenue does not even remotely fall within the zone of interests implicated by the 1987 law. Therefore, it has no standing to sue PASNY for an alleged violation of that law. (Matter of Oil Heat Inst. v Public Serv. Commn., 72 AD2d 828 [3d Dept 1979].)
Con Ed argues that, if it is denied standing, PASNY’s action here will be effectively insulated from judicial scrutiny. (Matter of Har Enters. v Town of Brookhaven, 74 NY2d 524, 529 [1989].) I disagree. There are parties who could suffer injury that falls within the zone of interests the Legislature sought to protect — for example, other businesses that might covet the power PASNY awarded to Smith Barney without going through the EDPAB procedures. Con Ed may have the greatest immediate incentive to challenge PASNY’s August 1997 resolution, but that alone is insufficient to confer standing.
2. In Any Event, PASNY’s August 1997 Resolution Did Not Violate the Law
Even if Con Ed had standing to challenge PASNY’s allocation of additional power to Smith Barney, the petition would nonetheless have to be dismissed. The 1987 law creating EDP and EDPAB quite clearly carved out an exception to its rules for Smith Barney’s preexisting contractual rights; legislation enacting article 6 of the Economic Development Law states that it does not affect the validity of “any contract or agreement for the sale or disposition of power produced by the power authority in effect on the effective date of this act during the remaining term thereof.” (L 1987, ch 32, § 6.) Contract FD-14 *240 was in effect on the date the 1987 legislation was enacted. Pursuant to that contract, Smith Barney had the right to request additional power at any time during the term of that contract, and PASNY had “sole discretion” to grant or deny any such request. At the time Smith Barney made and PASNY granted the request for the additional 4 MW, contract FD-14 had four years remaining in its term. Therefore, this exercise of their contractual rights fell within the express exception to the reach of the 1987 legislation. Any other conclusion would permit a legislative abrogation of Smith Barney’s and PASNY’s contractual rights, which is impermissible.
Con Ed argues that, because Smith Barney’s relinquishment of the 4 MW was deemed “permanent” under contract FD-14’s special provision C, the power thereby relinquished reverted to EDPAB control. It is indisputable that PASNY would have to follow the EDPAB procedures before allocating Fitzpatrick power relinquished by Smith Barney to some other entity. But the fact that Smith Barney’s 1993 relinquishment of 4 MW was “permanent” does not and cannot abrogate Smith Barney’s right, pursuant to special condition D, to request additional power in accordance with the contract’s term (one of which is that PASNY decides, in its sole discretion, whether or not to grant the request) at any time during the life of the contract. Contract FD-14 contains no suggestion that Smith Barney could not make such a request after it has “permanently” relinquished power to which it originally had a right under the contract. Therefore, the only fair and reasonable reading of the term “permanent” in contract FD-14 — i.e., the only reading that gives meaning both to special provision C and special provision D — is that if, after 1990, Smith Barney relinquished any of the 16 MW of power that PASNY was required to make available for its use under the original agreement, PASNY had no obligation to keep that power available for Smith Barney’s later use. PASNY (using the EDPAB procedure) could reallocate “permanently’ relinquished power elsewhere, and Smith Barney had no guarantee that it would be able to get that power back if it so requested pursuant to special provision D. It does not, however, mean that Smith Barney’s contractually permissible requests for power must pass through EDPAB while contract FD-14 is in force. This interpretation harmonizes the concept of “permanent” reduction in Smith Barney’s power allocation with Smith Barney’s unfettered right to ask for more power during the life of the contract and PASNY’s unfettered discretion to grant or deny such a request.
*241 Con Ed also contends that the August 1997 letter constitutes a wholly new agreement, which because it was made after July 1985, falls outside the 1984 legislation. This argument is most effectively refuted by the text of the letter itself, which is less than two pages long and does not even set forth enough essential terms to qualify as a contract without reference to the agreement it supposedly supersedes. Furthermore, as PASNY points out, under our law changes to particular terms in a contract do not abrogate the entire contract, but merely modify its terms. (Beacon Term. Corp. v Chemprene, Inc., 75 AD2d 350, 354 [2d Dept 1980].)
Because the contract savings clause of chapter 32, § 6 of the Laws of 1987 is dispositive, I need not and do not reach PASNYs other contract construction arguments.
The petition is dismissed.

. PASNY analyzes this point in terms of Con Ed’s relationship to the 1984 legislation pursuant to which contract FD-14 was signed, but that is not the statute Con Ed is invoking. Rather, Con Ed asserts that the 1987 legislation precludes PASNY from granting Smith Barney the increased power it seeks via modification of that contract. Therefore, the relevant inquiry is whether Con Ed’s economic interest falls within the zone of interests the Legislature sought to protect when it passed article 6 of the Economic *239 Development Law and amended Public Authorities Law § 1005, not when it originally passed section 1005.