[684 NYS2d 312]

In the Matter of NEW YORK STATE CONFERENCE OF BLUE CROSS AND BLUE SHIELD PLANS et al., Respondents, v EDWARD J. MUHL, as Superintendent of Insurance of the State of New York, et al., Appellants.

Third Department, January 21, 1999

## APPEARANCES OF COUNSEL

*Eliot Spitzer, Attorney-General,* Albany (*Victor Paladino* of counsel), for Edward J. Muhl and another, appellants.

*Werner & Kennedy,* New York City (*T. Richard Kennedy* of counsel), for Medical Malpractice Insurance Association, appellant.

*Iseman, Cunningham, Riester & Hyde, L. L. P.,* Albany (*Michael J. Cunningham* of counsel), for HANYS member Hospitals Self-Insurance Trust, appellant.

*Hinman, Straub, Pigors & Manning, P. C.,* Albany (*Kimberly C. Lawrence* of counsel), for New York State Conference of Blue Cross and Blue Shield Plans and others, respondents.

*Couch, White, Brenner, Howard & Feigenbaum,* Albany (*Harold N. Iselin* of counsel), for New York State Health Maintenance Organization Conference, Inc., respondent.

*LeBoeuf, Lamb, Greene & MacRae,* Albany (*Robert J. Alessi* of counsel), for Medical Liability Mutual Insurance Company, *amicus curiae.*

*Michael A. Haskel,* New York City, for Academic Health Professionals Insurance Association, *amicus curiae.*

*Rivkin, Radler & Kremer,* Uniondale (*Evan H. Krinick* of counsel), for Physicians Reciprocal Insurers and another, *amici curiae.*

OPINION OF THE COURT

GRAFFEO, J.

In response to the rising costs of medical malpractice premiums which threatened the availability of health care in New York, the Legislature and the Governor adopted a comprehensive legislative package in 1985 and 1986. These enactments included medical and dental malpractice litigation reforms, hospital malpractice prevention programs, provisions that streamlined physician discipline processes, measures to stabilize malpractice premium rates and, at issue in this proceeding, a new mechanism to finance excess medical and dental malpractice insurance coverage for hospital-affiliated physicians and dentists (*see,* L 1985, ch 294; L 1986, ch 266). In an effort to restrain increases in malpractice premium rates which jeopardized consumer access to health care and contributed to escalating health care costs, this legislation sought to provide more affordable malpractice insurance coverage for physicians and dentists (*see,* Governor's Program Mem for L 1985, ch 294, 1985 NY Legis Ann, at 131). As part of the malpractice measures, Insurance Law § 5502 was amended to provide hospital-affiliated physicians and dentists with an additional layer of $1 million of insurance protection in the event of malpractice judgments which exceeded their primary level of malpractice coverage, at no cost to the practitioners (*see,* L 1985, ch 294, § 18).* The Legislature accomplished this excess coverage through the creation of the Hospital Excess Liability Pool ([hereinafter the Pool] *see,* L 1986, ch 266, § 18). The Pool essentially collects premium payments from participating hospitals and purchases excess malpractice insurance for eligible doctors and dentists (*see,* L 1986, ch 266, § 18).

Respondents Superintendent of Insurance and Commissioner of Health were designated to be responsible for the administration of the Pool. In 1986, the Superintendent designated respondent HANYS Services Inc. (hereinafter HANYS), a private corporation authorized to write excess medical malpractice insurance policies, as the Pool administrator.

The Superintendent, acting pursuant to authority under the program, promulgated regulations each year establishing premium rates for the excess malpractice policies purchased through the Pool (*see,* L 1986, ch 266, § 40). These rates were formulated as a percentage of the primary coverage rates set

---

* Primary malpractice coverage is generally $1 million per claim and $3 million for all claims per policy year.

for respondent Medical Malpractice Insurance Association (hereinafter MMIA), a nonprofit unincorporated association of insurance companies established by the Legislature in 1975. Any eligible physician or dentist was entitled to obtain excess coverage and MMIA therefore received premium payments for such coverage from the Pool. Funding of the Pool was derived from hospital in-patient discharge "add-on" fees (surcharges on hospital bills) authorized by the Commissioner (*see*, L 1986, ch 266, § 18). Hospitals remitted the "add-on" charges to the Pool and recovered these costs through reimbursement from health insurers or uninsured patients. Certain third-party payors directly deposited their excess premium expense with the Pool.

After enactment of the 1985 and 1986 reforms, the Legislature modified the program to allow the Superintendent to determine whether the rates established for policies of excess malpractice coverage were projected to produce amounts greater than required to maintain solvency and "satisfy the standard that premiums shall be fixed at the lowest possible rates consistent with the maintenance of solvency and of reasonable reserves and surplus therefor" (L 1997, ch 161, § 2). If it is so determined, then the Superintendent "may direct any issuer of such policies to return to the purchasers all or a portion of such premium that is projected to be greater than required" (L 1991, ch 266, § 4). Based on this statutory authorization, in 1991 the Superintendent directed MMIA to refund $155 million to the Pool, and, similarly, respondents HANYS Insurance Company and HANYS Member Hospitals Self-Insurance Trust, as other providers of excess malpractice coverage, transferred $42 million and $13 million, respectively, to the Pool. The next two years the Legislature required MMIA to transfer $60 million and $150 million, respectively, to the State's general fund (*see*, L 1992, ch 55, §§ 419, 420; L 1993, ch 1, § 6). Apparently these transfers were effected, to some extent, to defray the State's Medicaid share of excess coverage costs (*see*, Dept of Health Mem, Bill Jacket, L 1991, ch 266). By similar statutory directive in 1996, MMIA transferred $481 million (*see*, L 1996, ch 309, § 270).

Each year since its inception, the Legislature has renewed the excess medical and dental malpractice program and, in June 1995, the program was extended for an additional year for malpractice policies issued or renewed from July 1, 1995 through June 30, 1996. Exercising his rate-setting authority, the Superintendent promulgated premium rates for hospital excess policies at 26.2% of the premium rate for primary coverage established for MMIA.

By petition and amended petition, petitioners and intervenors, consisting of various Blue Cross and Blue Shield plans, health maintenance organizations, prepaid health services plans and insurance companies, commenced this CPLR article 78 proceeding seeking, *inter alia*, to annul the Superintendent's 1995-1996 excess medical malpractice rate determination as arbitrary and capricious. Petitioners essentially alleged that an enormous accumulation of unexpended excess medical malpractice reserves from prior years had created "redundant" or "surplus" reserves in the Pool which had not been adequately taken into account by the Superintendent when establishing the 1995-1996 premium year rates. Respondents moved to dismiss the amended petition, claiming that the Superintendent had acted reasonably and rationally in establishing the rates for the premium year in question, that the claims raised in the petition were barred by collateral estoppel and/or the Statute of Limitations, and that petitioners lacked standing. By stipulation, petitioners withdrew four causes of action and Supreme Court granted respondents' motion and dismissed the remaining causes of action in the amended petition as being time barred except for the claim challenging the Superintendent's 1995-1996 excess rate determination. Concluding that the Superintendent's rate determination was arbitrary and capricious, Supreme Court annulled the 1995-1996 premium assessment and directed that premiums paid for policy year 1995-1996 be refunded to the payors. Respondents now appeal.

■ Initially, we find that petitioners have standing to challenge the Superintendent's 1995-1996 rate determination. A party claiming that it has standing must demonstrate "that the interest or injury asserted fall within the zone of interests protected by the statute invoked" (*Society of Plastics Indus. v County of Suffolk*, 77 NY2d 761, 773; *see, Matter of Dairylea Coop. v Walkley*, 38 NY2d 6, 9). Therefore, the injury asserted must fall within the "concerns * * * sought to be promoted or protected by the statutory provision under which the agency has acted" (*Society of Plastics Indus. v County of Suffolk, supra*, at 773). Here, the excess medical malpractice insurance program was enacted to stem rising health care costs associated with medical and dental malpractice insurance costs and to substantially enhance the reliability and predictability of medical malpractice insurance rate regulation (*see*, L 1986, ch 266, § 1). We find that petitioners' claims are encompassed within the zone of interests protected by the statute and, therefore, as aggrieved parties they have a direct interest in

reducing their expenses and system-wide health care costs as third-party payors of hospital services, including the excess malpractice surcharge, even though these costs may be passed on to their subscribers (*see, New York State Conference of Blue Cross & Blue Shield Plans v Axelrod*, 145 Misc 2d 336, 338; *cf., Matter of Roosevelt Raceway v County of Nassau*, 18 NY2d 30).

■ It is well settled that the standard for review for an administrative regulation is whether the regulation was arbitrary or capricious (*see, Matter of Consolation Nursing Home v Commissioner of N. Y. State Dept. of Health*, 85 NY2d 326, 331). An administrative agency is to be accorded great deference in its decision-making powers, especially where the agency acts within its area of expertise (*see, id.*, at 331; *New York State Assn. of Counties v Axelrod*, 78 NY2d 158, 166). Therefore, in reviewing the Superintendent's rate determination, a court should not substitute its judgment for that of the Superintendent (*see, Matter of Chemical Specialties Mfrs. Assn. v Jorling*, 85 NY2d 382, 396); the Superintendent's expertise in setting insurance rate determinations should be provided substantial deference and not disturbed unless petitioners satisfy their heavy burden of demonstrating that the rate determination was irrational (*see, Matter of Consolation Nursing Home v Commissioner of N. Y. State Dept. of Health, supra*, at 331-332; *Matter of Medical Malpractice Ins. Assn. v Superintendent of Ins. of State of N. Y.*, 72 NY2d 753, 761-762; *Matter of New York Univ. Med. Ctr. v Axelrod*, 188 AD2d 207, 210, *lv denied* 81 NY2d 711). Based on our review of the entire record, we determine that petitioners have not met their burden and we find that the Superintendent's determination concerning the excess rates for policy year 1995-1996 was not irrational or arbitrary.

In light of the Superintendent's authority to supervise the insurance industry and to promulgate regulations (*see, Blue Cross & Blue Shield v McCall*, 89 NY2d 160, 163), the Legislature expanded the powers vested in the Superintendent to include the establishment of excess medical malpractice insurance premium rates (*see,* L 1986, ch 266, § 40). The Superintendent must take into account several requirements in setting premium rates which "shall not be excessive, inadequate, unfairly discriminatory, destructive of competition or detrimental to the solvency of insurers" (Insurance Law § 2303) or "otherwise unreasonable" (Insurance Law § 2305 [b]). Consideration shall be "given to past and prospective loss experience * * * to past and prospective expenses * * * and * * *

unabsorbed premium deposits allowed or returned to policy-holders, members or subscribers" (Insurance Law § 2304 [a]; *see,* Insurance Law § 5505 [a]) in arriving at premiums at the lowest possible cost consistent with maintaining solvency and reasonable reserves and surpluses (*see,* Insurance Law § 5505 [b]). Additionally, all rates must be based on a sound actuarial basis (*see,* Insurance Law § 5505 [b]). Actuarial predictions are further complicated by the long period of time needed to accumulate data and claims experience regarding malpractice cases, especially in light of the fact that some claims are not paid for more than 10 years after the occurrence.

Here, in establishing the 1995-1996 excess rate, the Superintendent indicated that he reviewed reports, took into account the statutory factors and evaluated the financial condition of the insurers issuing medical malpractice insurance policies. Although the medical malpractice program amassed a huge accumulation in its reserves as evidenced by the transfers exceeding $500 million authorized by statute prior to the policy year at issue, nothing in the record indicates that the Superintendent failed to consider any of the appropriate statutory factors in setting the 1995-1996 excess medical malpractice premiums. A careful examination of the record reveals that the actuarial experts found the Superintendent's rate determination soundly based in actuarial principles and in compliance with the requirements of the applicable statutes. Although the Superintendent did not specifically set forth the standards in his rate determination, it is not *sine qua non* that the Superintendent did not follow the statutory rate-setting requirements.

Petitioners claim that the accumulation of excess premium reserves from prior periods creates an unnecessary surplus which demonstrates that the Superintendent failed to follow the statutory directive of considering past loss experience in setting the 1995-1996 excess premium rates. They also rely on more recent action by the Legislature, i.e., the $481 million appropriation by the State in 1996 (*see,* L 1996, ch 309, § 270) and the enactment of chapter 161 of the Laws of 1997 which allows the Superintendent to use surplus reserves to fund the premium expense for the 1997-1998 policy year (*see,* L 1997, ch 161, § 2), as evidence of the Superintendent's acknowledgment of surplus reserves. This argument, however, does not necessarily establish that the Superintendent's rate determination was arbitrary or capricious (*see, Matter of Consolation Nursing Home v Commissioner of N. Y. State Dept. of Health,* 85 NY2d 326, 331-332, *supra*). This retrospective examination fails to

provide a manifestation of whether the 1995-1996 rates were inadequate according to statutory standards. Notably, all parties acknowledged that not all of the malpractice claims have been paid, even those claims for the early premium years of the program, and, in furtherance of the legislative objective to expand the availability of excess coverage, new insurers who entered the market prior to 1995 had not yet accumulated sufficient reserves.

Moreover, respondents' actuarial expert testified that the prior rate levels had no bearing on the 1995-1996 rate determination because rate making is a prospective process and to make such a determination otherwise would conflict with basic tenets of insurance rate making. Although petitioners' expert came to a contrary result, "[a] disagreement among actuaries * * * is not evidence that the Superintendent's acceptance of one set of conclusions was arbitrary" (*Matter of Medical Malpractice Ins. Assn. v Superintendent of Ins. of State of N. Y.*, 72 NY2d 753, 763, *supra*). Although we acknowledge that the Superintendent is required to examine past loss experience (*see*, Insurance Law § 2304 [a]), we also recognize the Superintendent has discretion to assign appropriate emphasis to each of the rate-setting factors. Therefore, it is not irrational or unreasonable for the Superintendent to accord less weight to past loss experience, which is but one of various factors considered in developing a prospective excess rate, especially in consideration of the relatively limited duration and experience with excess medical malpractice insurance and the inherent risk associated with such claims. Significantly, excess malpractice premiums have been on a consistent decline to the extent that the 1995-1996 rate level was 50% of the 1988-1989 policy year rate.

We conclude that Supreme Court's determination was erroneous since it cannot be said as a matter of law that the Superintendent's rate determination for 1995-1996 was arbitrary or capricious. Therefore, petitioners have not satisfied their burden of demonstrating that the Superintendent's excess medical malpractice premium for 1995-1996 was unreasonable or irrational. Based on the foregoing, Supreme Court improperly annulled the Superintendent's 1995-1996 rate determination.

CARDONA, P. J., MERCURE, SPAIN and CARPINELLO, JJ., concur.

Ordered that the judgment is reversed, on the law, without costs, determination confirmed and petition dismissed.