Matter of Metropolitan Museum Historic Dist. Coalition v De Montebello (2004 NY Slip Op 50527(U))

[*1]

Matter of Metropolitan Museum Historic Dist. Coalition v De Montebello

2004 NY Slip Op 50527(U)

Decided on May 14, 2004

Supreme Court, New York County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on May 14, 2004

Supreme Court, New York County
In the Matter of the Application of METROPOLITAN MUSEUM HISTORIC DISTRICT COALITION, et al., Petitioners, For a Judgment Pursuant to Article 78 of the Civil Practice Law and Rules,
against
PHILIPPE DE MONTEBELLO, DIRECTOR, et al., Respondents.
Index No.: 119635/03

Marcy S. Friedman, J.
In this Article 78 proceeding, petitioners challenge respondents' actions in renovating the Metropolitan Museum of Art ("Museum") under a plan formulated in 2000 ("2000 Plan" or "Plan"). Petitioners seek to enjoin the renovation based primarily on their claims that respondents failed to conduct an environmental review required by the State Environmental Quality Review Act ("SEQRA") (ECL § 8-0101 et seq.); did not comply with the Uniform Land Use Review Procedure ("ULURP") (NY City Charter § 197-c); and violated an agreement to limit expansion, allegedly reached in 1971 between the Museum and the City of New York in connection with a major development plan adopted on the occasion of the Museum's centennial. Petitioners also seek enforcement of the alleged 1971 agreement, claiming that it not only limited expansion but imposed conditions for example, a requirement that the Museum open park side entrances upon the Museum's future operation.
Petitioner Metropolitan Museum Historic District Coalition ("MMHDC") is, as alleged in the petition, an unincorporated association formed in January 2001 to coordinate efforts to evaluate and respond to the Museum's 2000 Plan. It is comprised of residential tenants, shareholders and owners of buildings or apartments located in the historic district surrounding the Metropolitan Museum. Petitioner Patricia Nicholson is a founding member and president of MMHDC and resides at 1016 Fifth Avenue. Petitioner Shauna Tarshis Denkensohn has been a member of MMHDC since Spring 2001, and resides at 1025 Fifth Avenue.
[*2]
Respondents are the Metropolitan Museum of Art; Philippe de Montebello, its Director; David McKinney, its President; and James Houghton, Chair of the Museum's Board of Trustees (collectively "Museum respondents"). The municipal respondents include the City of New York ("City"); the City of New York Department of Parks & Recreation ("Parks Department"); the City of New York Landmarks Preservation Commission ("LPC"); Mayor Michael R. Bloomberg; and various other agencies and officials of the City (collectively "City respondents").
Factual Background
The Metropolitan Museum, a preeminent cultural institution, was established as an "educational corporation" in 1870 by an act of the New York State legislature for the purpose, among others, of "establishing and maintaining * * * a Museum and library of art, [and] of encouraging and developing the study of the fine arts." (L 1870, ch 197, as amended; Petition,
¶¶ 25, 55; Museum Answer, ¶¶ 25, 55.) After the enactment of legislation which authorized the City to construct a building for use by the Museum on City-owned land within Central Park, the Museum became a tenant under a lease with the City. While the City continues to own the building, the lease transferred possession of the building to the Museum for its exclusive use as an art museum and provided, among other things, that the Museum shall hold the lease on the building "as long as [it] * * * shall continue to carry out the objects and purposes defined in its charter * * * and shall faithfully keep, perform and observe the covenants and conditions herein contained on its part to be kept, performed and observed." (Lease, ¶ 1 [Pet. Ex. 6].)
In 1970, in connection with its centennial, the Metropolitan Museum embarked on a project of extensive renovation and expansion of its building and facilities. After considerable public comment and hearings, a "master plan" was approved by the Parks Department (the "Centennial Master Plan") which, according to architect Kevin Roche, one of the drafters of the plan, was intended as a "long-term plan that looks at the entire Museum's needs over a period of years." (Roche Aff., ¶ 2.) Implementation of the Centennial Master Plan continued over approximately two decades, and included the addition of five new wings for the exhibition of the Museum's collections, which expanded the building into previously undeveloped park land and nearly doubled the square footage of the existing space in the Museum. (See Roche "Master Plan" [Museum Ex. 3 to Gerrard Aff.].)
Most of the renovation and expansion work anticipated by the Centennial Master Plan was completed by the early 1990s. However, according to David McKinney, the "final leg" of the Centennial Master Plan the renovation of the Greek and Roman Galleries was not completed by the early 1990s and became part of a new "ten-year" plan which the Museum began to develop in the late 1990s. (McKinney Aff., ¶ 6.)
In the fall of 2000, the Metropolitan Museum formulated and presented for City approval the plan that is at issue in this proceeding. The 2000 Plan addressed completion of the Greek and Roman Galleries and proposed additional work to be done in other areas of the Museum. The work contemplated by the 2000 Plan, as set forth in an application form prepared by the Museum (Pet. Ex. 10), included: work affecting the Fifth Avenue facade; removing and replacing in kind the existing north and south plazas for below-grade construction; expansion of the Uris Center for Education; creation of a new underground receiving area for art, including a loading dock; creation of new third and fourth floor office areas above the Wing K Courtyard; new staff and public cafeterias and a new central kitchen; construction of a new auditorium, galleries, and [*3]library facilities within the existing museum; creation of new art storage areas below the existing north plaza; work on the mechanical equipment located on the roof; improvement of public entrances and escalators; as well as other work to the walls and roof. It is undisputed that the 2000 Plan called for the addition of approximately 200,000 square feet in the interior of the Museum (see McKinney Aff., ¶ 16) and, according to petitioners' calculation, an additional 100,000 square feet below the Fifth Avenue plazas.
The Museum's application for approval of the Plan was made on a form issued by the Landmarks Preservation Commission. The Museum submitted the form ("2000 Application") to Henry Stern, then Parks Department Commissioner, who signed and referred it to the LPC on or about December 19, 2000. The LPC then issued reports, dated March 27, 2001 and April 4, 2001, generally approving the work proposed by the Museum. (See Museum Ex. 4 to McKinney Aff.) The LPC subsequently issued an amendment, dated November 25, 2003, approving final plans for previously approved work consisting of interior alterations in Wing K, including construction of the new Roman Galleries, the addition of two floors above the second story roof which would not exceed the height of the existing roof line, and an extension of the second floor of the Rockefeller Wing. (Aff. of Brian Hogg [LPC Director of Preservation], ¶ 12; Ex. C to Hogg Aff.)
The petition alleges that adverse environmental impacts, including increased traffic, noise and fumes, will result from the work proposed under the 2000 Plan. While petitioners appear to contend generally that the magnitude of the square footage to be added to the interior of the Museum will cause such impacts, the petition also objects to specific aspects of the Plan, including its provision for temporary removal of the fountains on the north and south plazas, and blasting and excavation below them to permit underground construction; demolition and excavation under green lawn space within Central Park to permit construction of an internal truck thoroughfare; and elimination of 120 underground parking spaces. (Petition, ¶ 83.)
However, respondents' submissions in this proceeding make clear that the scope of the work in the 2000 Plan for which the Museum originally sought approval has been significantly reduced and does not currently encompass these specific items. (See McKinney Aff., ¶¶ 16, 19-20; Letter of Sharon Cott [Museum's General Counsel], dated July 17, 2003 [Pet.Ex. 12]; McKinney letter dated May 30, 2003 [Pet. Ex.13].)
It appears that, following the events of September 11, implementation of the 2000 Plan was "put on hold" and the Museum decided to review the entire plan the following spring. (McKinney letter dated Dec. 13, 2001 [Pet. Reply Ex. 6].) As explained by the Museum's President, as a result of lost revenues following September 11 as well as other economic factors, the Museum then decided to reduce the scope of the proposed work by deferring for the foreseeable future at least seven years some projects, including the construction of additional space under the plaza and an underground loading dock dedicated to art. (McKinney Aff., ¶¶ 19- 20. See Aff. of Adrian Benepe [Commissioner of Parks Dept.], ¶ 18.) The Museum has categorically represented that there are "no current plans to disturb the plaza fountains" (McKinney Aff., ¶ 20) and has stipulated, in the context of this proceeding, that "[a]ny such former plans are off the table and have been cancelled." (Stip. dated Apr. 5, 2004].) The Museum's current plans include the creation of about 40,000 square feet of additional interior space, not the more than 200,000 originally proposed. (McKinney Aff., ¶ 16; July 17, 2003 Cott [*4]letter [Pet. Ex. 12].)
Although it is unclear from the record when work under the 2000 Plan first began, it is not disputed that the Metropolitan Museum has now completed or commenced substantial portions of the work. (Aff. of Arnold Weiss [Pet. Attorney], ¶¶ 4-7.) To date, the Museum has expended 41 million dollars for construction under the Plan. (See Pet. Reply Memo. at 18-19; McKinney Aff., ¶ 15.) Completed work includes a new public cafeteria, a new kitchen next to the cafeteria, renovation of the loading dock at 84th Street inside the north garage, partial demolition of the old cafeteria in the Greek and Roman galleries, and temporary relocation of the Uris educational facilities. (McKinney Aff., ¶¶ 15-16; May 30, 2003 McKinney letter [Pet. Ex.13].) The major projects remaining under the 2000 Plan that are currently being implemented are the final stage of the renovation of the Greek and Roman galleries in Wing K; renovation of the Uris Education Center below the Greek and Roman galleries; and the addition of a second floor in the Rockefeller Wing for the display of art. (McKinney Aff., ¶ 16.)
The petition pleads ten causes of action: The first alleges violation of SEQRA based on respondents' implementation of the 2000 Plan without conducting an environmental review. The second alleges that respondents failed to comply with ULURP. The third and fourth are based on the Museum's failure to comply with the alleged 1971 agreement between the Museum and the City imposing conditions on future development and operation of the Museum. The fifth alleges that the Parks Department is required to make a determination, independent of the 1971 agreement, as to whether to grant consent to the Museum to proceed with the Plan. The sixth appears to allege that the Parks Department has not issued a required permit for the work. The seventh and eighth allege that respondents have failed to obtain approval from the Art Commission and the Landmarks Preservation Commission for removal, modification or replacement of the fountains. The ninth alleges that the Mayor has failed to determine whether acceptance of the gift of the renovations is in the best interest of the City. The tenth alleges that the Museum is subject to the Freedom of Information Law (Public Officers Law § 84 et seq.) ("FOIL"), and has failed to respond to petitioners' FOIL request. These claims will be addressed in turn.
SEQRA
As a preliminary matter, respondents contend that petitioners lack standing to assert their claims under SEQRA, and that the claims are barred by the statute of limitations, laches, and mootness. The court finds, for the reasons discussed below, that while petitioners have standing, the SEQRA claims are time-barred or, alternatively, moot as to certain renovations.
Standing
Standing is a "threshold determination, resting in part on policy considerations, that a person should be allowed access to the courts to adjudicate the merits of a particular dispute that satisfies the other justiciability criteria." (Society of Plastics Indus. v County of Suffolk, 77 NY2d 761, 769 [1991].) Under state law, the standing requirement derives from the common law precept that a court has no inherent power to act unless the rights of the plaintiff are affected. (Id. at 772.)
"For standing to sue, petitioners must show that they have suffered an injury in fact, distinct from that of the general public." (Matter of Transactive Corp. v New York State Dept. of Social Servs., 92 NY2d 579, 587 [1998].) It has been explained that " 'injury in fact' has [*5]become the touchstone [for standing] during recent decades" because "[t]he existence of an injury in fact
 an actual legal stake in the matter being adjudicated ensures that the party seeking review has some concrete interest in prosecuting the action which casts the dispute 'in a form traditionally capable of judicial resolution.' " (Society of Plastics Indus., 77 NY2d at 772 [internal citation omitted].) To this requirement of injury in fact, the courts "have added rules of self-restraint, or prudential limitations," including "the requirement that the interest or injury asserted fall within the zone of interests protected by the statute invoked." (Id. at 773.)
In order to establish organizational standing, a petitioner must satisfy a three-part test, demonstrating: "1) that one or more of its members has standing to sue; 2) that the interests advanced here are sufficiently germane to petitioner's purposes to satisfy the court that petitioner is an appropriate representative of those interests; and 3) that the participation of the individual members is not required to assert this claim or to afford petitioner complete relief." (Matter of Aeneas McDonald Police Benevolent Assn. v City of Geneva, 92 NY2d 326, 331 [1998]; Society of Plastics Indus., 77 NY2d at 775; Matter of Dental Socy. of the State of New York v Carey, 61 NY2d 330 [1984].) The requirement of injury in fact appears to explain the organizational standing requirement that one or more of the organization's members have individual standing. Thus, unless the members have standing, the organization "can claim none as their representative." (Matter of MFY Legal Servs., Inc. v Dudley, 67 NY2d 706, 708 [1986].)
In the instant case, petitioner MMHDC is an unincorporated association formed to evaluate the Metropolitan Museum's 2000 Plan and to compel the various City agencies to comply with the environmental and land use regulations which petitioners contend are applicable to the Plan. Petitioners Nicholson and Denkensohn, who are members of MMHDC, both reside in cooperatively owned buildings located on Fifth Avenue directly across from the Museum.
The individual petitioners allege standing based not merely on their proximity to the Museum, but on their specific claims of injury distinct from that of the general public. In particular, they allege that the expansion contemplated by the Plan will increase traffic congestion, noise and fumes from automobile emissions outside their apartments, and that demolition of the fountains will harm the aesthetic beauty of the Museum and involve protracted blasting which will impair their quality of life. (See Petition, ¶¶ 88-89; Nicholson Aff. In Support, ¶¶ 7-11.) These allegations state a claim of injury in fact. (Compare Matter of Committee To Preserve Brighton Beach v Planning Commn. of City of New York, 259 AD2d 26 [1st Dept 1999] with Matter of Save Our Main St. Bldgs. v Greene County Legislature, 293 AD2d 907 [3d Dept 2002], lv denied 98 NY2d 609.)
The individual petitioners accordingly have standing to assert their SEQRA claims. As MMHDC clearly satisfies the remaining elements of the standard for organizational standing, it may also maintain this proceeding.
Statute of Limitations
It is well settled that a four-month statute of limitations is applicable to allegations of SEQRA violations. (Matter of Young v Board of Trustees of Vil. of Blasdell, 89 NY2d 846 [1996]. See CPLR 217[1].) An agency action is final, and the statute of limitations is triggered, "when the decisionmaker arrives at a 'definitive position on the issue that inflicts an actual, [*6]concrete injury.' " (Stop-The-Barge v Cahill, 1 NY3d 218, 223 [2003] [quoting Matter of Essex County v Zagata, 91 NY2d 447, 453 [1998].) As the Court of Appeals has clarified:

"[A] determination will not be deemed final because it stands as the agency's last word on a discrete legal issue * * *. There must additionally be a finding that the injury purportedly inflicted by the agency may not be prevented or significantly ameliorated by further administrative action or by steps available to the complaining party. If further agency proceedings might render the disputed issue moot or academic, then the agency position cannot be considered definitive or the injury actual or concrete."
(Stop-The-Barge, 1 NY3d at 223 [quoting Matter of Essex County, 91 NY2d at 453-454].)
In order to determine when a statute of limitations is triggered, it is thus necessary to determine when the agency reached a "definitive position" on an issue which implicated SEQRA, and the petitioner thereby became aggrieved by an alleged violation of that statute. (See Stop-The-Barge, 1 NY3d at 223; Matter of Broderick v Castro, 284 AD2d 909 [4th Dept 2001].) Where one or more agencies makes successive determinations on a project to which SEQRA may be applicable, the statute of limitations will run from the first such determination. (See, e.g, Matter of Young, 89 NY2d at 849 [statute of limitations triggered when Village Board of Trustees, without conducting any SEQRA review, approved lease of property to development group for construction of waste facility; Board's subsequent allegedly inadequate SEQRA review did not toll statute of limitations on first action approving lease]; Stop-The-Barge, 1 NY3d at 223-224 [agency's issuance of conditional negative declaration ("CND") under SEQRA gave developer ability to proceed with project without preparing environmental impact statement, and thus was final agency action which triggered statute of limitations; second agency's subsequent issuance of permit that allowed facility to operate did not toll statute of limitations for challenge to CND].)
In the instant case, respondents contend that the Parks Department committed to the 2000 Plan when then Commissioner Stern signed the 2000 Application for approval by the Landmarks Preservation Commission of work contained in the Plan. Noting that the Landmarks Preservation Commission subsequently approved certain of the projects in March 2001,[FN1] the Museum respondents contend that the statute of limitations for challenging these projects under SEQRA expired in 2001. (Museum Memo. In Opp. ["Museum Memo."] at 25.) Differing in a minor respect from the Museum respondents, the City respondents contend that the Parks Department approval of the 2000 Plan was embodied in the December 19, 2000 application, and that the statute of limitations ran from December 2000. (City Memo. In Opp. ["City Memo."] at 15.)
In reply, petitioners argue that the 2000 Application could not be a final approval of the Plan by the Parks Department because the application was signed by Commissioner Stern prior to the Landmarks Preservation Commission's issuance of a report on the Plan, contrary to the requirements of Administrative Code of the City of New York § 25-318. In the alternative, they claim that even assuming that the 2000 Application constituted an approval, it was "ineffective" [*7]or void ab initio because made in violation of this Administrative Code section. (Pet. Reply Memo. at 14-15.) Petitioners also argue that the Landmarks Preservation Commission could have refused to approve the Plan or have directed that it be altered, and that the Parks Department approval therefore was not final because not the "last word" on the Plan. (Id. at 16.)
In order to determine whether the 2000 Application triggered the statute of limitations, close scrutiny of the document and the circumstances under which it was executed is required. On its face, it is an application by the Parks Department, as owner of the Museum, to the LPC for approval of the work set forth in the application.[FN2] However, it also served as an application by the Museum to the Parks Department for approval of the Plan: It is undisputed that it was not executed by Commissioner Stern until after he and other Parks Department representatives had met with the Museum to discuss the Plan on several occasions in the fall of 2000. The information in the application form was completed by the Museum, and transmitted by the Museum to the Commissioner with a written request that the Commissioner execute the application form "seeking approval for the scope of work to implement the advances which were presented to you on November 13" as well as an expanded scope of work including work beneath the plaza. (See Pet. Ex. 10.) The 2000 Application is the sole writing evidencing the Parks Department's action on the Museum's 2000 Plan. Significantly, also, there is no evidence in the record that the Parks Department undertook any further review or executed any further approval of the 2000 Plan after Commissioner Stern executed and referred the Application to the Landmarks Preservation Commission on or about December 19, 2000.[FN3] Based on these circumstances, the court finds that the 2000 Application embodies the Parks Department's approval of the Plan.[FN4]
Petitioners correctly contend that to the extent the application form constitutes an approval of the 2000 Plan, it was made in violation of Administrative Code § 25-318. As the Parks Department approval was given prior to referral of the Plan to the Landmarks Preservation [*8]Commission, it violated the express terms of subdivision (a) of the Code.[FN5]
Contrary to petitioners' further contention, however, the Administrative Code violation is of a minor procedural nature which did not render the approval ineffective (cf. Crell v O'Rourke, 88 AD2d 83 [2d Dept 1982], affd for reasons stated below 57 NY2d 702), particularly under these circumstances in which the LPC issued approvals of the work by March and April 2001, and there is no claim that any work was performed that was not within the scope of the LPC approvals.
Further, this is not a case in which the Parks Department lacked authority to approve the Plan. On the contrary, petitioners expressly acknowledge that the Parks Department, "as guardian of Central Park," was the agency responsible for approval of alterations to the Museum buildings (and contend that it failed to discharge its responsibility in compliance with governing environmental and land use regulations). (See Pet. Memo. of Law at 14-15, 36-37. See also NY City Charter §533[a][6].) Thus, the Parks Department's execution of the 2000 application did not involve an act without or in excess of its authority which would be void and therefore ineffective to trigger the statute of limitations. (See generally Abiele Contr., Inc. v New York City School Constr. Auth., 91 NY2d 1 [1997]; Foy v Schechter, 1 NY2d 604 [1956]. Compare Matter of Aldous v Town of Lake Luzerne, 281 AD2d 807 [3d Dept 2001].)
More importantly, the critical issue is not whether the Parks Department's 2000 Application constituted an approval of the Plan, but whether it was a final agency action that triggered the statute of limitations for purposes of a SEQRA challenge. Whether or not the application was an "approval," it indisputably constituted the act by which the Parks Department took the "definitive position" that it would not conduct a SEQRA review of the Museum's Plan, and proceeded to implement the Plan by referring it to the LPC without a SEQRA review. Petitioners do not contend otherwise and, indeed, in their moving papers (as opposed to their reply) argued not that there was no approval and thus in effect no Parks Department action, but [*9]rather that the Parks Department had acted wrongfully by implementing the Plan without required SEQRA review. (See Pet. Memo. of Law at 1, 18-19.)[FN6]
There is also no showing on this record that any subsequent approvals that may have been required to implement the Plan would have altered or ameliorated the Parks Department's determination in 2000 not to conduct a SEQRA review. The LPC's consideration of the 2000 Plan was not subject to SEQRA review, as its determination was governed by architectural, aesthetic and historical criteria which bore no relationship to the environmental concerns that govern a SEQRA review. (See Matter of Citineighbors Coalition of Historic Carnegie Hill v New York City Landmarks Preserv. Commn., 306 AD2d 113 [1st Dept 2003].) In addition, while petitioners claim that a permit must be issued for the work contained in the Museum's Plan, petitioners fail to submit any authority that a permit for the interior work at issue would involve the exercise of discretion concerning environmental factors, and therefore would qualify as an agency action subject to SEQRA. (See Incorporated Vil. of Atl.Beach v Gavalas, 81 NY2d 322 [1993]; State Environmental Quality Review Regulations [6 NYCRR] § 617.5 [c] [19].) Moreover, even if a future agency action in issuing a permit were to require a SEQRA review, it would not revive the statute of limitations on the Parks Department's prior determination to permit the Plan to be implemented without such review. (See Matter of Young v Board of Trustees of Vil. of Blasdell, 89 NY2d 846, supra.)
There can also be no serious dispute on this record that petitioners were aware by early 2001 that the Parks Department had either approved the Plan or made a determination to implement the Plan without performing a review under SEQRA. Petitioners acknowledge that following the Parks Department's December 2000 submission of the application form to the LPC, the LPC, Community Board 8 and the Museum held numerous meetings with the community regarding the 2000 Plan. Petitioner Nicholson states that she attended virtually every one of the meetings and that, at the meetings, the Museum's representatives made presentations that included descriptions of the contents of the Plan. (Nicholson Aff. In Support, ¶ 4.) Petitioners also do not dispute that they were aware of the approvals of the Plan issued by the LPC in March and April 2001. Rather, petitioners contend that they were apprised by the Museum in December 2001 that the Plan had been put on hold, and that they were not subsequently given adequate information as to when construction would begin. (See Nicholson Reply Aff., ¶¶ 23-27.) What is significant for statute of limitations purposes, however, is not what information petitioners had about the commencement of construction, but what information they had about whether the Parks Department had approved the Plan or made a determination to implement the Plan without [*10]SEQRA review.
The record contains uncontroverted evidence that the Museum and the Parks Department took the position, in communications to the community dating back to 2001, that the plan had been implemented with the necessary approvals. For example, in the Museum's December 13, 2001 "Dear Neighbor" letter, the Museum's president publicly stated not only that the Plan had been "put on hold" due to an uncertain economy but also that the plan "had been underway with approval from the New York City Landmarks Preservation Commission." (Pet. Reply Ex. 6.) Respondents also submit the affidavit of Commissioner Stern attesting that during his tenure (which expired in 2002), he personally spoke with Ms. Nicholson and "informed her about Parks' decision to approve the plan." (Stern Aff., ¶ 11.) Tellingly, in her reply, Ms. Nicholson does not dispute that the Commissioner advised her of the approval, and states merely that in a conversation with Commissioner Stern on February 21, 2001, he did not "ever indicate that the Museum had commenced any construction relating to the [Plan], nor did he give me any indication whatsoever when such construction would commence." (Nicholson Reply Aff., ¶ 32.)
As petitioners argue, an agency's issuance of a determination will not cause the statute of limitations to begin to run "when the agency itself has created an ambiguity as to whether or not the determination was intended to be final." (Matter of Biondo v New York State Bd. of Parole, 60 NY2d 832, 834 [1983].) Here, however, while petitioners demonstrate uncertainty as to when certain construction under the Plan would begin, they point to no evidence that respondents created any ambiguity as to whether they had approved or implemented the Plan without SEQRA review. Absent such evidence, petitioners' subjective understanding that there had not been an approval (see Nicholson Reply Aff., ¶ 29), even if credited, cannot serve to raise a triable issue of fact in this regard.
Finally, although petitioners characterize this proceeding as one in the nature of mandamus to compel respondents' compliance with SEQRA, the proceeding in fact seeks review of a determination that has already been made the Parks Department's 2000 action foregoing SEQRA review of the Museum's Plan. Thus, the statute of limitations runs from the agency determination and not from petitioners' demand for the agency to conduct a SEQRA review. (See Matter of Sierra Club, Inc. v Power Auth. of State of New York, 203 AD2d 15 [1st Dept 1994].)
The court has considered petitioners' other arguments in opposition to respondents' contention that the SEQRA claims in this proceeding are time-barred, and finds them to be without merit. The court accordingly holds that as the agency determination not to undertake a SEQRA review in connection with the Plan was final in December 2000, and this proceeding was not commenced until November 2003, petitioners' claims under SEQRA are untimely.
Mootness
The Museum respondents alternatively argue that petitioners' SEQRA challenge is moot as to restoration of the Greek and Roman galleries in Wing K and renovation of the Uris Education Center beneath Wing K because substantial work has been completed on these projects. It is undisputed that restoration of the Greek and Roman galleries is in its final phase, the Museum having completed Phases I through III which involved removal of a public cafeteria that had been installed in Wing K in 1949, apparently to the dismay of subsequent generations. It is also undisputed that the Museum was awarded 5.7 million dollars under a contract with the [*11]City's Department of Design and Construction for Phase III alone (see Pet. Ex. 11.) The Uris Education Center has also been temporarily relocated in preparation for renovation of the space under Wing K. (See McKinney Aff., ¶ 15.) Further, it is not claimed that the completed work could be easily undone and, in fact, petitioners expressly represent that they do not seek to undo any completed work. (Pet. Reply Memo. at 18.)
Under these circumstances, the court finds that petitioners' SEQRA challenge is moot as to work under the Plan to renovate the Greek and Roman galleries and the Uris Education Center. (See Matter of Dreikausen v Zoning Bd. of Appeals of City of Long Beach, 98 NY2d 165 [2002].)
ULURP
A four-month statute of limitations applies to a claim that the City's approval of a project violated ULURP. (See Matter of Douglaston & Little Neck Coalition v Sexton, 145 AD2d 480 [2d Dept 1988].) In the instant case, the Parks Department's December 2000 action on the Plan was concededly undertaken without any review under ULURP. The statute of limitations has passed on petitioners' ULURP claim for the reasons stated in connection with the SEQRA claim.
Petitioners' claim that the Parks Department's approval was subject to ULURP is also without merit. Contrary to petitioners' contention, the work called for in the Plan did not involve "site selection for a capital project" or disposition of City owned property, consent to which is subject to ULURP review under New York City Charter §§ 197-c (a) (5) and (10). (See Tuck v Heckscher, 29 NY2d 288 [1971]; Community Alliance For Responsible Dev., Inc. v American Museum of Natural History Planetarium Auth., NYLJ, Mar. 21, 1997, at 29 col 5 [applying Tuck to case arising after enactment of ULURP].) Nor do petitioners cite authority in support of their further contention that the Plan involved a franchise subject to ULURP under § 197-c (a) (6).
1971 Agreement
Petitioners allege that in 1971, the Museum entered into an agreement (the "1971 Agreement") with the Parks Department's predecessor (hereafter "Parks Department") under which, in exchange for Parks Department approval of the Museum's Centennial Master Plan, the Museum agreed to a number of conditions that would govern future development and operation of the Museum. The Centennial Master Plan's provision for the construction of new wings in what had formerly been park space was the subject of public controversy and considerable negotiation. The Museum does not dispute that as a condition for approval of that expansion, its Board of Trustees adopted a resolution agreeing that it would not in the future expand beyond the perimeter of the building at Fifth Avenue and 82nd Street. (Resolution dated Sept. 24, 1970 [Museum Ex. 8 to Gerrard Aff.]; McKinney Aff., ¶ 9.) However, the parties strongly disagree as to whether any additional conditions were agreed to in connection with the approval of the Centennial Master Plan.
Petitioners claim that the Museum agreed to further conditions including, among others: "not seek to expand the overall size or number of its collections";[FN7] to commit to a program of decentralization involving long and short-term loans of art to neighborhoods throughout the City; [*12]to carry out the " 'original idea' that constituted a rationale for placing the Museum Facility in the park * * * namely, to transform it into a 'museum to be entered from the park and enjoyed by park people' "; to ensure access to the Museum from the park by opening park entrances and glass courts; and to alleviate traffic problems on Fifth Avenue by construction of a large number of underground spaces and other measures. (Pet. Memo. of Law at 33-34.) Petitioners further contend that the Museum never complied with these conditions.
The Museum and City respondents both deny that agreement was reached on any of these additional conditions. Respondents also contend that the statute of limitations has passed on petitioners' claims relating to the 1971 Agreement, and that petitioners lack standing to enforce the alleged agreement.
In support of their claims, petitioners submit the affidavit of Thomas Hoving, who was the Museum's Chief Executive Officer at the time of the negotiations. Mr. Hoving sets forth his recollection of the negotiations and asserts that the Museum agreed to the additional conditions summarized above. Petitioners also submit a statement of then Parks Department Commissioner, August Heckscher, dated January 20, 1971 ("Heckscher Statement"), which was included, along with the Centennial Master Plan, in a publication entitled The Second Century - The Comprehensive Architectural Plan for the Metropolitan Museum of Art. (Pet. Ex. 7.) Although neither the Heckscher Statement nor any other writing evidences the Museum's agreement to conditions other than that prohibiting it from expanding beyond the perimeter of the Fifth Avenue building, the evidence on this issue is discussed at some length as it was a significant focus of the parties' arguments.
The Heckscher Statement announced the Parks Department's approval of the Master Plan and described the Plan, noting that it had "the great merit of restoring the building to the park" by adding entrances on the park side as well as "courts which form a fine transition between the world of nature and the world of art." As to conditions imposed on the approval, the Statement provided in pertinent part:
This Department has had two deep, specific concerns in regard to these matters. It has negotiated these at length with the Trustees of the Museum and with staff members.
1. We are anxious that this will truly be a comprehensive plan that it will put an end to piece-meal building or unco-ordinated expansion. The permit for the Lehman Pavilion is, therefore, to be issued with the express understanding that future building will not take place outside the limits of the plan to which approval has been given. This assurance of the Board of Trustees is reinforced by a stated policy to the effect that the Museum will not seek to expand the overall size or number of its collections, but will confine its acquisitions in the future to increasing their excellence and representative quality.
2. We have been concerned lest tremendous effort involved in completing this plan should lead to a neglect by the Museum of responsibilities to the neighborhoods and boroughs of the City. As an answer to this the Trustees appointed a special committee on decentralization, and in September, 1970, voted approval of a program of decentralization committing the Museum to long-term and short-term loans, as well as exploration of making works of art available as outright gifts. This goes further than the Museum has ever done in asserting its City-wide role. It is a form of decentralization which is, I believe, more significant than offering to partition or divide up the central institution.
[*13]
The Heckscher Statement itself thus does not by its terms assert that the Parks Department received any "assurance" from the Museum other than the assurance regarding expansion of the building. The alleged agreement not to expand the Museum's collections is referred to merely as a "stated policy" (which is not documented by any evidence), while the alleged agreement to decentralize is referred to as a "program." The Statement is silent as to any assurances with respect to permanently opening park side entrances or maintaining glass courts, or alleviating traffic congestion.
As Mr. Hoving implicitly acknowledges in his affidavit, Commissioner Heckscher had requested specific assurances beyond an agreement to limit expansion into the park, and they were not forthcoming. Thus, by letter dated April 9, 1970 to Douglas Dillon, the Museum's then President, the Commissioner raised

three cardinal points the resolution of which can be decisive in advancing the whole plan. These involve guarantees running beyond the terms of any of us now involved. 1. Assurance that the proposed entrances on the West Side be always kept open to the public* * *. 2. Assurance that the proposed courts on the West Side be always kept as landscaped glass enclosures* * *. 3. Assurance that the proposed Master Plan represent the limits of all future expansion by the Museum that in effect, such additional rights to expansion as are given by the 1887 legislation be voided.
(Pet. Ex. 42).[FN8]
It is undisputed that in response to this letter, the Board of Trustees, at a special meeting on September 24, 1970, adopted a resolution limited to authorizing an assurance that the Museum would not expand beyond the perimeter of the Fifth Avenue building. This resolution noted that the Board of Trustees "is in agreement that, after the completion of the construction envisaged in the [Master Plan] * * *, no further expansion of the perimeter of the building at Fifth Avenue and 82nd Street * * * into areas presently used as a park, will be necessary." It then authorized and directed its legal counsel "to work out with the appropriate City authorities, assurances of this nature, which shall be submitted to the Board of Trustees or Executive Committee for final approval." (Museum Ex. 8 to Gerrard Aff.) A copy of this resolution was forwarded to Commissioner Heckscher and reaffirmed by letter from Mr. Dillon to the Commissioner, dated February 10, 1971. (Museum Ex. 9 to Gerrard Aff.)
The record contains no evidence that any subsequent assurances were given to the Parks Department. On the contrary, the Commissioner himself appears to have been concerned about the sufficiency even of the Museum's assurance to limit further expansion. Thus, by letter dated March 2, 1971 (Museum Ex. 10 to Gerrard Aff.), he requested an opinion on the issue from the [*14]Corporation Counsel who, so far as appears from the record in this proceeding, did not respond.[FN9]
The documentary evidence thus fails to support petitioners' contention that the Museum entered into the alleged 1971 Agreement providing for conditions additional to its agreement not to expand beyond the perimeter of the Fifth Avenue building. Although the parties also offer the contradictory recollections of various participants in the negotiations in support of their respective positions as to whether there was an agreement to additional conditions, they do not address the legal issue of whether testimonial evidence would be admissible to prove an agreement which would arguably modify the parties' written lease.
The court need not reach this issue, however, as petitioners claims based on breach of the alleged 1971 agreement are not maintainable. Petitioners plead two such claims: They seek an injunction directing the City respondents to determine whether the Museum has complied with the conditions and, if not, to make a determination, based on the best interest of the people of the City, whether to enforce or waive the conditions. (Petition, Third Cause of Action, ¶ 177.) Alternatively, based on their contention that as a result of the Museum's breach of the 1971 agreement, "the City and, derivatively, the public, has been derived of the benefits of the 1971 Agreement," they seek an order of "specific performance" in their own right, compelling the Museum to comply with conditions of the 1971 agreement. (Petition, Fourth Cause of Action,
¶¶ 190, 193.)
Although the fourth cause of action pleads a claim based on a third party beneficiary theory, petitioners specifically represent on their reply that they are not alleging that they are third party beneficiaries. (Pet. Reply Memo. at 38, n 12.) Petitioners thus effectively abandon the fourth cause of action.
As to the third cause of action seeking to compel the City to review the alleged 1971 agreement and to determine whether to enforce it, petitioners fail to cite any authority that a proceeding in the nature of a mandamus to compel may be maintained by a private individual, lacking third party beneficiary status, to require the City to enforce its own contract. Nor do petitioners demonstrate that they seek to compel performance of a ministerial, as opposed to a discretionary, act. However, it is well settled that mandamus to compel performance by an administrative agency of a duty enjoined by law "lies only where the right to relief is 'clear' and the duty sought to be enjoined is performance of an act commanded to be performed by law and involving no exercise of discretion." (Matter of Hamptons Hosp. & Med. Ctr. v Moore, 52 NY2d 88, 96 [1981]; Vink v New York State Div. of Hous. and Community Renewal, 285 AD2d 203 [1st Dept 2001].)
Remaining Causes of Action
Petitioners' remaining causes of action do not require extensive discussion. The fifth cause of action alleges that the City respondents are required, independent of the 1971 Agreement, to review the 2000 Plan to determine whether the work is appropriate "and in the [*15]interests of Central Park, the City of New York and its constituents." (Petition, ¶ 197.) As this claim seeks to compel performance of a discretionary rather than a ministerial action, it is not maintainable. (See id.) The sixth cause of action appears to seek relief based upon the Parks Department's failure to issue a permit for the work in the Plan. (Petition, ¶ 206.) However, no showing is made that the Parks Department is the appropriate agency to issue a permit for the interior work at issue or that permits, if required for interior work, have not been issued.
The seventh and eighth causes of action allege that the 2000 Plan includes work to remove and replace the fountains located in the plazas on Fifth Avenue, and that the Museum has failed to obtain required approvals for this work from the Art Commission and Landmarks Preservation Commission, respectively. (Petition, ¶¶ 215, 223.) While the Plan, as originally submitted, called for work under the plazas that would have affected the fountains, the Museum respondents have categorically represented that "[b]ecause the plaza excavation project is not currently planned to occur, there are also no current plans to disturb the plaza fountains." (McKinney Aff., ¶ 20.) In addition, the Museum has agreed in a stipulation entered into in this proceeding that any former plan for removal, replacement or modification of the fountains has been "cancelled" and that the Museum "will seek any necessary approvals from the appropriate City agencies if it decides to either: remove, replace or modify the fountains; or excavate under the plaza for any purpose except maintenance or repair of existing infrastructure; or engage in blasting or dynamiting." (Stip. dated Apr. 5, 2004, ¶ 1.) Petitioners' causes of action as to the fountains are therefore moot.
Petitioners' ninth cause of action alleges that the privately funded portions of the 2000 Plan constitute a gift to the City and should be enjoined until the Mayor undertakes review to determine whether to accept the gift. (Petition, ¶¶ 227, 230.) Even assuming that the improvements under the Plan constitute a gift to the City, petitioners fail to show that acceptance of the gift involves a mandatory, as opposed to a discretionary, action. The authority on which petitioners rely is not to the contrary. Tuck v Heckscher (29 NY2d at 295) held that the Mayor had the "power" to accept a gift to the Metropolitan Museum (of the Lehman Wing) but not that he was required to do so.
FOIL
Petitioners' final claim is that the Museum is a public agency subject to the Freedom of Information Law, and wrongfully failed to respond to petitioners' request for documents. FOIL is applicable to an "agency" (Public Officers Law § 87), which is defined in pertinent part as "any state or municipal department, board, bureau, division, commission, committee, public authority, public corporation, council, office or other governmental entity performing a governmental or proprietary function for the state or any one or more municipalities thereof
* * *." (Id., § 86[3].)
The facts concerning the Museum's organization and funding are not in dispute: The Museum, a not-for-profit corporation, works closely with City agencies and receives significant support from the City, including the right to occupy City-owned property in perpetuity and substantial City funding for capital projects. However, the City does not control the Museum's Board or management. (McKinney Aff., ¶ 29.) While five City officials serve as ex officio trustees on the Museum's Board of Trustees, the Board consists of up to 40 trustees who are self-elected, and the City has no authority to hire or fire the Museum's Director or President. (Id.) [*16]The City's operating and capital budgets are now largely privately funded (see id. at ¶ 23), and are not subject to government approval. Nor, however important its cultural purpose, does the Museum perform services that have been recognized as a governmental function.
On these facts, the Museum does not qualify as an "agency" for FOIL purposes. (Compare Matter of Buffalo News, Inc. v Buffalo Enterp. Dev. Corp., 84 NY2d 488, 490 [1994][holding FOIL applicable to local development corporation which was defined by N-PCL 1411[a] as not-for-profit corporation "performing an essential governmental function," and which had budget subject to public review and significant representation by City officials on its Board of Directors] with Lugo v Scenic Hudson, Inc., 258 AD2d 626 [2d Dept 1999][holding FOIL inapplicable to not-for-profit corporation which had self-governed Board of Directors, operating budget not subject to government approval, and primarily private funding].)
Finally, as the Museum is not controlled by elected or other public officials, there is no danger that they may act through the Museum as a means of shielding their actions from public scrutiny. Thus, FOIL's important purpose of promoting open government and providing the public with access to governmental records (see Matter of Buffalo News, 84 NY2d at 492) is not implicated.
Conclusion
Although the court concludes that the petition must be dismissed in its entirety, it is noted that petitioners raised a serious issue as to whether the Plan required review under SEQRA: It was conceded that the Plan, as originally submitted for approval to the Parks Department and the Landmarks Preservation Commission, provided for an expansion of the Museum's usable interior space by at least 200,000 square feet, and an expansion beneath the fountains of an additional 100,000 square feet as calculated by petitioners. A substantial question was thus presented as to whether this work exceeded applicable 120,000 or 60,000 square foot thresholds for the Parks Department's action to have qualified as a Type II action exempt from SEQRA review. (See 6 NYCRR §§ 617.5 [c][2]; 617.4 [b][6][v]; 617.4 [b][10].) The court has not reached the merits of this issue in view of its holding that the statute of limitations bars the SEQRA claims.
The court's dismissal of the SEQRA claims based on the statute of limitations should not, however, be construed as holding that work specified in the Plan but deferred by the Museum will not be subject to SEQRA review if undertaken in the future. As the record of this proceeding makes clear, since submission of the Plan for approval in 2000, the Museum has proceeded with an expansion of only approximately 40,000 square feet, and has cancelled or deferred the remainder of the expansion provided for by the Plan. The effect of this change in circumstances on the applicability of SEQRA to future performance of the deferred work is an issue that was not addressed by the parties and was not before the court.
The petition is accordingly dismissed.
This constitutes the decision and order of the court.
Dated: New York, New York
May 14, 2004
________________________
MARCY FRIEDMAN, J.S.C.
Footnotes

Footnote 1:In fact the LPC approvals were dated March 27 and April 4, 2001. (See Museum Ex.4 to McKinney Aff.) 

Footnote 2:The application to the LPC was required to be made by the Parks Department because an application to perform work on a designated landmark must be signed by the owner of the property. (See Landmarks Preservation Commission [63 RCNY] § 2-01.)

Footnote 3:The Museum's request for execution of the application form was dated December 22, 2000, while the date December 19, 2000 had been typed next to the line for Commissioner Stern's signature. To the extent that petitioners suggest that this minor irregularity invalidates the approval, this contention is without merit. 

Footnote 4:While the court finds that the 2000 Application constitutes the Parks Department's approval of the Plan, it must be noted that the parties' sharp dispute over the issue could easily have been avoided by more care on the Parks Department's part in contemporaneously documenting its negotiations with the Museum regarding the Plan, as well as its consideration and approval of the Plan. Such care would clearly have been warranted given the magnitude of the Plan, and its potential impact on the public.

Footnote 5:The parties dispute whether subdivision (a) or (b) of section 25-318 was applicable to the Parks Department's approval of the Plan. Subdivision (a) provides that plans for improvements on a City-owned property "shall, prior to city action approving" the plans,"be referred by the agency of the city having responsibility for the preparation of such plans to the [Landmarks Preservation Commission] for a report." Subdivision (b) provides that plans for improvements on a City-aided project shall not be approved by a City agency "unless, prior to such approval," the agency "has received from the [LPC] a report on such plans."
Respondents persuasively argue that the Plan involves City-owned property rather than a City-aided project within the meaning of section 25-318. They also concede that subdivision (a) applied to approvals of the Plan. However, respondents further appear to argue that because the Museum rather than the Parks Department prepared the Plan, the Parks Department was not subject to the subdivision (a) requirement that it refer the Plan to the LPC prior to giving its approval to the Plan. This argument renders their acknowledgment of the applicability of subdivision (a) meaningless.

Footnote 6:More particularly, petitioners initially argued that "[r]espondents' decision to proceed with the [Plan] in the absence of a preliminary inquiry as to whether it constitutes an 'action' and, if so, what type (i.e., Type I, II or Unlisted), violated SEQRA." (Pet. Memo. of Law at 18.) To the extent that petitioners further argue that there was no final determination because the Parks Department failed even to make a preliminary inquiry as to whether SEQRA was applicable (see Pet. Reply Memo. at 34-35), the argument is inconsistent with their initial argument and, in any event, plainly incorrect. Under settled authority, the failure to consider SEQRA constitutes the final determination from which the statute of limitations begins to run. (See Matter of Young v Board of Trustees of Vil. of Blasdell, 89 NY2d 846, supra.) 

Footnote 7:Although not clearly articulated by petitioners, their argument appears to be that breach of the alleged agreement not to expand the Museum's collections has caused a need for expansion of the Museum which, in turn, will have adverse environmental impacts.

Footnote 8:This letter treated decentralization not as a matter for an assurance but a "matter of a somewhat different kind."

Footnote 9:In this letter, Commissioner Heckscher acknowledged that the only documentation he had received of the Museum's assurances was the September 24, 1970 Board resolution and Mr. Dillon's February 10, 1971 letter. Petitioners' issue as to whether there was a November 1970 Executive Committee meeting at which the Museum approved further assurances, thus appears to be a red herring.